## STATE v. JOSEPH M. FRAYLON.

(Filed 4 June, 1954.)

**1. Insurance § 25½—**

In presenting a false claim and proof in support of such claim for payment of loss, or other benefits upon a contract of fire insurance, a defendant must have acted willfully and knowingly in order to be convicted under G.S. 14-214. The term "willfully and knowingly" defined.

**2. Same—**

The existence of unreported liens or other insurance upon the property is a civil matter governed by G.S. 58-178, 58-180, but does not tend to show criminal intent in connection with the filing of proofs of claim. G.S. 14-214.

**3. Same—Evidence held insufficient to show that defendant willfully and knowingly presented fraudulent claim and proofs in support thereof.**

In this prosecution under G.S. 14-214, the State offered witnesses, none of whom were contractors or experienced builders, and some of whom admitted they were not qualified to testify as to the cost of labor and materials, who testified as to their opinion of the value of the property at the time of the fire in an amount substantially less than the insurance on the property, and evidence that defendant filed claim for the total amount of the insurance in the sum of $18,500. Defendant introduced testimony to the effect that the cost of replacement would be from $16,128 to $19,600, evidence as to cost of improvements made upon property prior to the fire, etc., that defendant had secured a contract for sale of the property at $25,000, and other evidence as to rental value of the property prior to the fire. Defendant made conflicting estimates of the value of the property at the time of the fire, between $23,000 and $25,000. *Held:* The evidence is insufficient to raise more than a suspicion or conjecture as to the good faith of defendant in fixing the value of the damaged structure at the time of the fire at $23,000 in his proofs of claim for loss, and therefore the evidence is insufficient to show that the defendant willfully and knowingly presented a false and fraudulent claim and proof in support of such claim, and his motion for judgment as of nonsuit should have been allowed.

**4. Same—**

The procuring of overinsurance is not a crime, though it may be a civil wrong under certain circumstances.

APPEAL by defendant from *Armstrong, J.,* October Term, 1953, of GUILFORD (Greensboro Division).

Criminal prosecution tried upon indictment charging the defendant with willfully and knowingly presenting false and fraudulent claims and false and fraudulent proof of such claims, for the payment of a loss upon two contracts of fire insurance on a building located at 1303 Willow Road, in the City of Greensboro, with the fraudulent intent to collect insurance.

The evidence in pertinent part is set out in the numbered paragraphs below.

1. The defendant is a citizen and resident of Charlotte, North Carolina, and purchased the property in question in 1946 or 1947 from J. A. Bigelow for $2,500. The building on the lot at 1303 Willow Road, at the time the property was purchased by the defendant, consisted of four rooms with a shed. The property was condemned by the Assistant Building Inspector of the City of Greensboro on 6 July, 1951. The house was occupied at the time and continued to be for a month or more thereafter.

2. On 21 August, 1951, the defendant obtained a permit to repair the condemned property and to remove a small house adjacent thereto and known as 1303½ Willow Road.

3. According to the State's evidence the defendant, prior to the fire on 11 March, 1953, had remodeled and enlarged the house to fourteen or sixteen rooms; that it was a two-story dwelling, frame construction, composition roof, sheet rock on the inside but incompleted, partially wired—the rough wiring being completed, but the fixtures and outlets were not in; it was partially painted on the outside; no plumbing or heating equipment had been installed.

4. The defendant, on 7 January, 1953, wrote the Wimbish Insurance Company, Greensboro, North Carolina, that he owned a fifteen-room, two-story frame house at 1303 Willow Road, Greensboro, North Carolina, a three-room frame house at 1301 Willow Road, and a nine-room house and a two-car garage at 1111 Willow Road. He stated the fifteen-room house was new and requested that it be insured for $8,500, the three-room house for $1,000, the nine-room house for $5,000, and the two-car garage for $1,000. C. C. Wimbish, of this insurance agency, testified that after receiving the letter he immediately issued a binder and later called the defendant at his home in Charlotte in order to obtain certain "additional information which I would have to have . . ., meaning the amount of the mortgage, if any, the values and whether or not he had adequate insurance." The defendant asked him what he thought he should have; that he told him he should have eighty per cent of the value; that the defendant said the property at 1303 Willow Road was worth around $10,000 and he thought $8,500 would be adequate; that there were no mortgages and no other insurance on the property. This agency issued and mailed to the defendant a policy in the amount of $15,500 covering the defendant's properties in the respective amounts requested, for and on behalf of The Royal Exchange Assurance of Royal Exchange, London, England, dated 8 January, 1953. The policy contained an endorsement thereon as follows: "Other insurance permitted." This witness also testified that he did not see the property or have it inspected before he issued the policy. After the fire, he requested the defendant to get some estimates on what it would cost to "reproduce" the property.

5. W. D. Seawell, witness for the State, who was the rental agent of the defendant at the time the property was condemned in 1951, testified that early in January, 1953, the defendant came to his office and told him he had done considerable remodeling on his Willow Road property; that he had bought several thousand dollars worth of materials and wanted his firm to insure it for $10,000; that he and his brother went out and inspected the property and did not insure it; that in his opinion the house at that time was worth between $4,000 and $4,500. On cross-examination this witness testified that before the property was condemned and immediately thereafter, his firm collected rents from the four-room house, including the property at 1303½ Willow Road which rented for $7.50 per month, as follows: March 1951, $100.00; April 1951, $90.00; May 1951, $111.50; and in July 1951, $90.00. That he was sure his firm had the property insured at that time but he could not find his records on it.

6. Clarence Winchester, a real estate and insurance man in Greensboro, testified that as agent of Bankers Fire Insurance Company of Durham, North Carolina, he issued to the defendant a policy on 30 January, 1953, insuring the property at 1303 Willow Road in the sum of $10,000. That he went to see the defendant and talked to him about insurance. That he was the rental agent of the defendant before and at the time the policy was written. That when he wrote the policy the defendant told him there was a mortgage on the property and gave him the required information about it. That the same day the fire insurance policy was written, he rented the property to Robert Booker, 407 Best Street, Greensboro, North Carolina, for $30.00 per week. That Booker agreed to purchase the property for $25,000 on or before 1 February, 1954, and to make a cash payment thereon of $5,000, the balance of the purchase price to be payable at $25.00 per week, plus interest at six per cent, payable weekly. After the payment of $5,000, all the rents theretofore paid were to be credited on the balance due. The defendant secured the purchaser and took him to Winchester's office. That the witness prepared the contract of rental and sale. The State introduced this agreement in evidence. Winchester further testified that Booker lived in the Willow Road house from 30 January, 1953, until the fire on 11 March, 1953, and that he paid his rent in accordance with his agreement. That the witness was familiar with the property and in his opinion, just before the fire, it was worth $7,000; that it was a two-story frame house, fifteen or sixteen rooms. That "the rooms were average size, maybe one or two extra small ones. . . . no plumbing, it had stoves for heating." On cross-examination this witness was questioned as to why he issued a $10,000 policy on a building worth only $7,000. He testified, "I did not know there was other insurance on the house when I issued the policy . . . I knew it didn't make any differ-

ence what amount it was insured for, that the most a person could recover for damage or loss was the value of the property. . . . I put the insurance on what I thought it was going to be worth. This policy was issued at the same time I had this transaction with Booker."

7. Clark Little, an insurance adjuster, testified that he knew the defendant Rev. Joseph M. Fraylon; that the first time he saw him was the day after the fire at 1303 Willow Road; that he inspected the premises; that the building was not completely destroyed by the fire. From his inspection after the fire he could at that time determine what kind of construction had been there before the fire. That he made such an inspection and in his opinion the building before the fire was worth $6,000, "but it would take $6,380.00 to put it back." That he had a conversation with the defendant about how much insurance he had on the property, and the defendant informed him that the two policies were all the insurance he had. The witness informed him that he thought he had it insured for about three times its worth, and Fraylon said he valued the house at $25,000. Later the adjuster mailed to the defendant forms on which to file his proofs of loss. The claims were duly executed on 10 April, 1953, for the full amount of insurance in force, and mailed to the respective insurance companies who in turn forwarded them to the adjuster. The proofs of claim fixed the value of the building at the time of the fire at $23,000.

8. R. L. Turnage, an investigator for the State Insurance Department, made an investigation of this fire. He testified that he had a conversation with the defendant and asked him if he knew where Booker was at that time, and he said he did not; that he had not seen him since the day after the fire; that Booker had told the defendant that he expected to get the down payment for the purchase of the property from an uncle; that he then told the defendant that he had talked with Booker in jail in Charlotte where he was being held for failure to comply with a sentence imposed in the Domestic Relations Court which required him to pay a certain sum for the support of his family. The defendant stated that he knew nothing of Robert Booker's personal affairs; that the defendant also told him he had paid L. H. Smith approximately $8,000 for labor that had gone into the building; that Rev. J. A. Bigelow had also done some work on the property but he didn't give the extent of his work. He stated that the majority of the materials had been purchased from the New Home Building Supply of Greensboro. This witness further testified that he had talked with L. H. Smith, who lives on Route 2, Kannapolis, North Carolina, and had obtained a verbal statement from J. A. Bigelow.

9. The State introduced as exhibits the policies of insurance, the proofs of claim, and a subpoena for L. H. Smith that was issued 3 November,

1953, and had not been served. Other evidence bearing on the value of the property was also introduced on behalf of the State.

10. The defendant introduced one James Clark who testified that he was foreman for some time during the remodeling of the defendant's property. That he and four other carpenters worked on the house; that they lived in Charlotte and brought five or six loads of lumber on a two and a half ton truck from Charlotte consisting of framing, sheeting and roofing, and that the materials went into this building.

11. The defendant offered three local contractors who testified as to the cost of rebuilding the damaged property. According to their testimony, the workmanship on the damaged building was inferior; that the carpenters were inexperienced; that their estimates were based on a new building, similar in size, but completed in a first-class workmanlike manner; that the present structure was damaged beyond repair. One estimate was $16,128, and the other two estimated that it would cost $19,600 to rebuild the apartment house.

12. The defendant offered in evidence a subpoena that had been duly issued by the Clerk of the Superior Court of Guilford County to the Sheriff of Cabarrus County, to summon L. H. Smith to appear in the Superior Court of Guilford County on 3 November, 1953, and testify in behalf of the defendant in the case of *State v. Joseph M. Fraylon,* showing a return by the Sheriff of Cabarrus County that it had been received on 30 October, 1953, and served on the same day. The said L. H. Smith had been called in open court by the defendant as a witness and had failed to respond when called.

From a verdict of guilty the defendant appeals, assigning error.

*Attorney-General McMullan, Assistant Attorney-General Love, and Gerald F. White, Member of Staff, for the State.*

*Brock Barkley for defendant, appellant.*

DENNY, J. The defendant has brought forward twenty-five assignments of error based on exceptions duly taken in the course of the trial below, among them being his assignment of error based upon exceptions to the failure of the trial judge to sustain his motion for judgment as of nonsuit made at the close of the State's evidence and renewed at the close of all the evidence. If this assignment of error is sustained it will be unnecessary to consider or discuss the remaining ones.

The pertinent parts of the statute which the defendant is charged with having violated read as follows: "Any person who shall willfully and knowingly present or cause to be presented a false or fraudulent claim, or any proof in support of such claim, for the payment of a loss, or other benefits, upon a contract of insurance; . . . shall be punishable by im-

STATE *v.* FRAYLON.

prisonment for not more than five years or by a fine of not more than five hundred ($500.00) dollars, or by both . . . within the discretion of the court." G.S. 14-214.

It follows, therefore, that the real question to be determined in considering the defendant's motion for judgment as of nonsuit is whether the evidence in the trial below, when considered in the light most favorable to the State, tended to prove that defendant "willfully and knowingly" presented "a false and fraudulent claim" and presented "proof in support of such claim," or did it merely raise a suspicion or conjecture as to his guilt of the charge contained in the bill of indictment. *S. v. Stephenson,* 218 N.C. 258, 10 S.E. 2d 819; *S. v. Johnson,* 199 N.C. 429, 154 S.E. 730.

The above question is so vital to the disposition of this assignment of error, we think it is proper to analyze the evidence adduced in the trial below.

The testimony of the State's witnesses tended to show that the defendant purchased the property in question, known as 1303 Willow Road, in 1946 or 1947 for $2,500. At that time a house consisting of four rooms and a shed and an additional small building were located on the lot. Before making any improvements on the property, W. D. Seawell, rental agent for the defendant, was renting the property in 1951 at the time it was condemned, for an average monthly rental of $97.88. That thereafter, on 21 August, 1951, the defendant applied for and obtained a permit from the City of Greensboro to remove the small house on the lot and to repair the other house. That the defendant rebuilt and enlarged the house to contain fourteen or sixteen rooms; that he claimed to have spent several thousand dollars for materials, and to have paid one L. H. Smith $8,000 for labor on the building; that in addition thereto one J. A. Bigelow had also done some work on the property; that the majority of the materials used in the building had been purchased from the New Home Building Supply in Greensboro; and that the agent of one of the insurance companies involved requested the defendant to obtain estimates on what it would cost to "reproduce" the property; that in January, 1953, the property was rented to a tenant who had entered into a written contract to purchase it for $25,000 on or before 1 February, 1954, and that the defendant said he valued the house at $25,000.

The defendant offered evidence tending to show that certain carpenters from Charlotte were employed for sometime in remodeling and enlarging the building involved, and that they brought five or six loads of lumber on a two and a half ton truck from Charlotte consisting of framing, sheeting, and roofing, and that this lumber went into the building. The defendant also offered three witnesses who had made and submitted estimates on behalf of two local contractors as to the cost of rebuilding the damaged property. These witnesses testified that the workmanship on

the damaged building was inferior; that the carpenters who constructed it were inexperienced; that their estimates were based on a new building, similar in size, but completed in a first-class workmanlike manner. One estimate was $16,128, and the estimate made and submitted on behalf of the other contractor was $19,600. The letter containing this latter proposal reads as follows: "We propose and agree to rebuild the apartment house at 1303 Willow Road as it existed before it was destroyed by fire for the sum of NINETEEN THOUSAND, SIX HUNDRED DOLLARS ($19,600)."

The first policy of insurance was written on the defendant's various properties for a total of $15,500 and included the sum of $8,500 on the damaged building. This policy was written without an inspection of the property as required by law, G.S. 58-175.1, and carried an endorsement thereon to the effect that other insurance was permitted. The second policy for $10,000 was not applied for by the defendant but was solicited by the insurance agent, who knowingly wrote it, according to his testimony, for more than the value of the property. This same agent prepared the lease and sale agreement. He testified that he inspected the property and wrote the policy for what he thought the house was going to be worth. It appears he made no inquiry about other insurance, testifying that he knew it made no difference what amount it was insured for, that the insured could only recover the value of the loss or damage sustained. In this connection, it is not clear as to how much work, if any, was done on the damaged building after the insurance policies were written.

The State points out that when the first policy was written the defendant stated there were no mortgages outstanding against the property, but he informed the agent otherwise when the second policy was written. Be that as it may, the State offered no evidence tending to show that there were any liens outstanding against the property on 8 January, 1953, the date of the first policy. Even so, the fact that certain liens were set out in the proofs of claim filed with the respective insurance companies does not tend to show criminal intent in connection with the filing of proofs of claim. Moreover, the effect unreported liens or other insurance will have as to the validity of a fire insurance policy, in the event of a loss, is a civil matter governed by statute. G.S. 58-178 and G.S. 58-180.

The State introduced no evidence tending to contradict the statements of the defendant in respect to the cost of labor in constructing the house, or to show the actual cost of the various materials purchased from the New Home Building Supply of Greensboro, which materials were used in the construction of the building. It contented itself in this respect by introducing witnesses who gave their opinion as to the value of the house at the time of the fire. None of these witnesses fixed the value in excess of $7,000. However, the State offered no evidence bearing on the cost of

rebuilding the damaged building except opinion evidence by witnesses who were not contractors or experienced builders, some of whom frankly admitted that they were not qualified to testify as to the cost of the labor and materials necessary to construct the damaged building.

It must be conceded, we think, that the evidence disclosed raises a serious doubt or suspicion as to the good faith of the defendant in fixing the value of the damaged building at the time of the fire at $23,000 in his proofs of claim for loss. But, in light of the following facts, we do not think the filing of the proofs of claim for the full amount of the insurance sufficient to show that the defendant "willfully and knowingly" violated the statute involved for the purpose of collecting a false claim: (1) That while the building was damaged by fire beyond repair, its outer walls were still intact and the character of its construction and kind of materials used therein were available for all to see, (2) the insurance adjuster had made his inspection of the damaged property, arrived at his final determination of the value of the building at the time of the fire, and was in serious disagreement with the defendant as to its value before he furnished him the forms upon which to file his proofs of claim, (3) all the evidence relied upon by the State had been obtained before the proofs of claim were filed, and (4) the proofs of claim contain no information that conflicts with the defendant's contention with respect to the value of his property at the time of the fire, except he listed the value of the damaged building as being $23,000 instead of $25,000 as he had theretofore contended. Where the facts are available to all parties, the question as to the value of a damaged building at the time of a fire resolves itself largely into a matter of opinion by qualified witnesses. "Value is necessarily a matter of judgment, and, furthermore, a matter of judgment in which each person is prone to err in overestimating his own. Of course, overvaluation is an evidence of fraud, but it does not amount to fraud where it expresses the *bona fide* opinion of the insured." Cooley's Briefs on Insurance, 2nd Edition, Volume 7, page 5851.

It is true that in this case, as in the case of *S. v. Stephenson, supra,* the defendant made various contradictory statements as to the value of his property. But the question is: Did the defendant willfully and knowingly intend to violate the statute for the purpose of collecting a false claim? As to the meaning of "willfully and knowingly," *Winborne, J.,* in speaking for the Court in the last cited case, said: "The word 'willfully' as used in this statute means something more than an intention to commit the offense. It implies committing the offense purposely and designedly in violation of law. *S. v. Whitener,* 93 N.C. 590; *Foster v. Hyman,* 197 N.C. 189, 148 S.E. 36. The word 'knowingly' as so used, means that defendant knew what he was about to do, and with such knowledge, proceeded to do the act charged. These words combined in the

phrase 'willfully and knowingly' in reference to violation of the statute, mean intentionally and consciously."

It is not a crime to procure overinsurance; it may be under certain circumstances a civil wrong. Appleman on Insurance Law and Practice, Volume 19, Section 10534, page 238; 44 C.J.S., Insurance, section 90, page 604, *et seq.* Neither does one "willfully and knowingly" violate a statute when he does that which he believes he has a *bona fide* right to do. *S. v. Whitener, supra; S. v. Crosset,* 81 N.C. 579; *S. v. Ellen,* 68 N.C. 281; *S. v. Hanks,* 66 N.C. 612.

The defendant is not charged with a conspiracy to procure excessive insurance on his property and with having burned it or causing it to be burned in order to collect the insurance. Neither is he charged with burning the property, but only with willfully and knowingly filing a false claim for the purpose of collecting upon the policies of insurance issued to him.

In view of the conclusion we have reached, the judgment of the court below is

Reversed.