The ROYAL EXCHANGE ASSURANCE,
Appellant,

v.

Joseph M. FRAYLON and Wife, Imedeow
Fraylon, Appellees.

No. 7093.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 18, 1955.

Decided Dec. 16, 1955.

McNeill Smith and Bynum M. Hunter,
Greensboro, N. C. (Smith, Moore, Smith
& Pope, Greensboro, N. C., on the brief),
for appellant.

A. L. Meyland, Greensboro, N. C., and
Brock Barkley, Charlotte, N. C. (Block,
Meyland & Lloyd, Greensboro, N. C., on
the brief), for appellees.

Before PARKER, Chief Judge, SO-
PER, Circuit Judge, and R. DORSEY
WATKINS, District Judge.

SOPER, Circuit Judge.

This appeal was taken from a judgment of the District Court wherein it was found that the Reverend Joseph M. Fraylon was entitled to recover the sum of $6,432.45 from The Royal Exchange Assurance on a policy of fire insurance issued on January 8, 1953 covering a house at 1303 Willow Road, Greensboro, North Carolina, which was so badly damaged by fire on March 11, 1953 as to be worthless. The insurance company resisted the payment of the loss on the grounds that the insured had misrepresented and concealed material facts in his application for the policy in suit, and that after the fire he wilfully and fraudulently misrepresented that the house was worth $23,000 when he well knew it was worth much less. The case was tried by the District Judge sitting without a jury, who rejected these defenses and having determined the value of the property to be $14,000 at the time of the fire, found for the plaintiff in an amount proportionate to the amount of total insurance on the property. We are of opinion that the judgment should be sustained insofar as it relates to the defenses of false misrepresentation and concealment, but that the property was not worth the sum of $14,000 and hence the amount of the verdict for the plaintiff should be reduced.

It was provided in the contract of insurance that the entire policy should be void, if, before or after a loss, the insured wilfully concealed or misrepresented any material fact or circumstance concerning the insurance or the subject thereof, or the interest of the insured therein. There was substantial evidence on behalf of the company that in applying for the policy the insured stated that the building was new and that there were no mortgages on the property. The facts were that the building was not new but was remodeled, and that there were several mortgages outstanding in the aggregate sum of $6,757.50. The court concluded, however, that the company had not borne the burden resting upon it under the law of North Carolina to prove that material misrepresentations were

actually made or that there was intentional concealment of a material fact which the insured had reason to believe under the circumstances would be likely to influence the company to reject the insurance. See Gibson v. Central Manufacturers' Mut. Ins. Co., 232 N.C. 712, 62 S.E.2d 320; Wells v. Jefferson Standard Life Ins. Co., 211 N.C. 427, 190 S.E. 744; Thomas-Yelverton Co. v. State Capital Life Insurance Co., 238 N.C. 278, 77 S.E.2d 692.

Although the property, when the insured acquired it, was a four-room wooden structure with a shed in the rear in such bad condition that it had been condemned by the city, the judge found that the insured secured a permit from the city and remodeled it so extensively that it was virtually a new structure containing fifteen rooms. The agent did not comply with the North Carolina statute, G.S. § 58–175.1, which requires every agent of a fire insurance company, before issuing a policy of insurance on property situated in any city or town, to inspect the same and inform himself as to its value and insurable condition. As to the mortgages the District Judge found that the insured did not make a statement in a telephone conversation, attributed to him by the policy-writing agent, that there were no mortgages on the property. The written application for the policy contained the statement that there were no mortgages, but this paper was prepared by the agent and not submitted to or signed by the insured. The judge also held that the absence of wilful or intentional misrepresentation by the insured in this respect was shown by the fact that later in the same month he applied for additional insurance on the property in another company, as permitted by the policy in suit, and gave the names of the mortgages to the insurance agent telling him that he needed insurance because the mortgagees were pressing him to secure it. The judge further found that the plaintiff was a minister of the gospel, inexperienced in fire insurance, and did not know that the existence of mortgages on the property was material. It is ob-

vious from the record in the case that the judge gave careful consideration to the controverted issues in the case, and we are unable to say that his findings with respect to these questions were erroneous. The critical finding, however, is that the misrepresentations were not made, for it is the law of the state that the making of an untruthful statement by the insured, material to the risk and relied on by the insurer, will avoid a policy of fire insurance, even if the statement is made innocently and in good faith. See Thomas-Yelverton Co. v. State Capital Life Insurance Co., supra.[1]

 The insurance company makes the point in the course of its argument that the proof of loss filed by the insured did not conform with the requirements of the policy in certain important parts, and hence the insurance was invalidated. The contention is hardly worth mentioning since the representative of the insurance company had evidently made up his mind to recommend the rejection of the claim when he sent the proofs to the insured to be executed, and it would have been as vain and useless a thing to file the proofs under the circumstances as if liability under the policy had been expressly denied by the company. See Williams v. Greensboro Fire Insurance Co., 209 N.C. 765, 185 S.E. 21. The judge in his conclusions of law held that the filing of the proof of loss was waived by the company.

The circumstances, however, should be outlined because of their bearing on the defense that the policy was avoided by fraudulent misrepresentations in the proof of loss as to the value of the property. The judge reached the conclusion of fact based on substantial testimony that proof of loss was obtained from the insured as the result of an understanding between the adjuster of the company and city and state officials who suspected that the fire was incendiary, but were unable to secure evidence to warrant a criminal prosecution. In this situation, the adjuster, having inspected the damaged building and conferred with the insured, and having learned that he was claiming that the building was worth the sum of $25,000, sent him the forms for the proof of loss and warned him that it must be filed under the terms of the policy, expecting that he would make an extravagant claim as to the value of the property, and thus lay himself open to criminal prosecution for fraud. In response the insured did file the proof and asserted therein that the value of the house was $23,000. Thereupon he was indicted under the state statutes and convicted of the crime of wilfully and knowingly presenting a false and fraudulent claim to the insurance company. The conviction, however, was reversed in State v. Fraylon, 240 N.C. 365, 82 S.E.2d 400, on the ground that the evidence, which was substantially the same as that in the pending case, was insufficient to sustain the charge; and the District Judge below in discussing the evidence presented to him quoted from the decision of the North Carolina court.

1. The concealments of which the company complains relate to the same matters as the alleged misrepresentations, except as to the charge that the insured did not disclose that he had applied for insurance on the property to the agent of another company who inspected the property and informed him that it was not interested. This circumstance was not pleaded in defense of the suit but came out during the testimony offered by the Insurance Company on the question of valuation; and the judge made no specific finding in regard thereto. It is obvious, however, from the view that he took of the evidence and his comment upon the inexperience of the insured, that he did not regard this circumstance as invalidating the policy. Concealment of a material fact does not invalidate a policy unless it is intentional and relates to a fact which the insured has reason to believe would be likely to influence the insured to reject the insurance. See Transcontinental Insurance Co. v. Minning, 6 Cir., 135 F.2d 479; Roberto v. Hartford Fire Ins. Co., 7 Cir., 177 F.2d 811, certiorari denied 339 U.S. 920, 70 S. Ct. 622, 94 L.Ed. 1343; Wytheville Insurance Co. v. Stultz, 87 Va. 629, 13 S.E. 77.

■■ On this account the insurance company now contends that the District Judge's conclusion that the insured's estimate of the cash value of the house was not knowingly false should not be sustained because it rests on the finding of the Supreme Court of North Carolina in the criminal case. The argument is based on the rule that the evidence of acquittal in a criminal action is not admissible in a civil action involving the same or similar facts. See New York Life Ins. Co. v. Murdaugh, 4 Cir., 94 F.2d 104. But it does not appear that the District Judge failed to observe the rule in the pending case. It is clear from reading his opinion that he based his findings on his own evaluation of the evidence and that he cited the conclusions of the Supreme Court of North Carolina upon the same facts merely in support of the conclusions which he had independently reached. Furthermore, the rule is not strictly applicable here because the conclusion of the Supreme Court of North Carolina was not based upon the doctrine of reasonable doubt but upon the finding that the evidence of fraud on the part of the defendant was too unsubstantial to justify its submission to the jury.

■ We think, however, that the evidence does not justify the finding that the house was worth $14,000 at the time of the fire. The testimony on behalf of the plaintiff consists of a narrative of facts without verification and of expert opinions, irrelevant in some measure to the point at issue, and these two classes of evidence lead to conclusions inconsistent with one another. The house at No. 1303 Willow Road and the lot on which it stands, together with an adjacent three-room wooden structure were purchased by Fraylon on June 13, 1950 for $2500. Both of these houses were condemned in 1951 and in August of that year Fraylon was granted permission to repair 1303 Willow Road and bring it up to the city code at an estimated cost of $1500. Thereafter and until the time of the fire in March, 1953, the work of reconstruction was intermittently carried on and evidence of the extent of this work was offered by the plaintiff in an effort to show the value of the structure when it was burned.

This evidence may be summarized as follows: Fraylon estimated in his testimony that he spent $15,000 on the building so as to convert it into a fifteen room house. He brought five men from Charlotte in 1951 and they worked eight or nine weeks at the rate of $1.75 per hour and received in all $4200. They were supervised by one J. A. Bigelow who was a builder and also a preacher, and at the time of the trial was conducting a nursing home. Bigelow worked part of the time and received $700. The work stopped in October, 1951 and was resumed in March, 1952 and continued for the rest of the year under one L. H. Smith and three or four men and boys. Fraylon said he paid Smith $2400—whether for material or services is not disclosed—and paid his help $1800. Materials of the value from $1100 to $1600, according to Fraylon's estimate, were brought from Charlotte in 1951 and $2887 was spent for materials bought in Greensboro. These figures aggregate approximately $14,000 and, if accepted as correct, would show that substantial additions were made to the property. They lack, however, not only precision but verification. Fraylon had no supporting records of any kind except the evidence of materialmen to the extent of $2900. He kept no records, had no bank account or cancelled checks, paid everything in cash except in a few instances when he used checks drawn on the bank account of his church, and he produced no receipts and no working plans for the building.

Bigelow was produced as a witness but he kept no records at any time. Smith could not be found at the time of the trial. The source from which Fraylon obtained the money other than the sum of $6757.50 borrowed on the mortgages was not explained. Undoubtedly considerable work was done on the building but the probative forces of this evidence to

establish either the amount of the expenditures or the value of the property is at the minimum.

The next step in the plaintiff's proof of value was a written contract of rental and sale dated February 1, 1953 which was offered to show that Fraylon rented the property for $30 a week and at the same time sold it for $25,000, of which $5,000 was to be paid on February 1, 1954 and the balance at the rate of $25 per week, the rents thereafter to be credited on the purchase price. The purchaser was one Robert Booker, a shadowy and fugitive character, according to the evidence. Fraylon met Booker for the first time in January, 1953 at the house. Thereupon he says Booker offered to buy the property for anything that Fraylon asked. Fraylon knew nothing about him and made no inquiry as to his character, reputation or financial condition. Booker was present at the fire on March 11 in a drunken condition, and after the fire he was confined in jail in Charlotte on account of family trouble and Fraylon had one interview with him. He then vanished from the case and could not be found at the time of the trial. This episode throws some light on Fraylon's methods and judgment, but it does not aid him in fixing the value of the property.

Finally, the plaintiff offered the testimony of three experts on building construction as to the value of the property at the time of the fire. J. N. Coe, building contractor, estimated it would cost $16,128 to build a new house of the same size as Fraylon's, including brick foundations, a new roof, bath rooms, plastered walls and kitchen equipment. Coe's estimate was for a building which would resemble Fraylon's only in size. He made no estimate of the value of the building at the time of the fire.

F. A. Mayfield, who inspected the house after the fire, estimated that it would cost from $13,000 to $14,500 to construct a building on the shell that was there. He could only estimate since he did not know the requirements as to plumbing and heating. He had no opinion as to the value of the building before the fire and his figure was for a new structure.

W. H. Morris, an estimator for the building supply house, said that it would require materials worth $7243.95 to construct a house of the same size and number of rooms.

No one of these witnesses expressed an opinion as to the value of the house before the fire and all estimated on the cost of the new structure. Consequently their opinions are of little help on the point in issue. This fact becomes the more clear when it is borne in mind that Fraylon's house had no lighting fixtures or plumbing, no kitchen equipment, no basement, no fire place but one space burner, no plaster and was constructed with a composition roof and walls of sheet rock. Moreover, we are concerned primarily with the market value of a made-over structure and not what it might cost to take a dwelling house with four rooms and convert it into one of fifteen rooms.

Compared with this uncertain and somewhat irrelevant testimony, the evidence of value offered by the insurance company is clean-cut and specific. All of it was given by experienced persons who saw the structure before the fire and were competent to appraise its value. William Sewell and J. K. Sewell, real estate and insurance men, examined the house on or about January 1, 1953 as the result of an application by Fraylon for $10,000 of insurance and valued it from $4,000 to $4,500. They refused to place any insurance upon it.

James D. Hughes, a building contractor of twenty years' experience, who examined the property at the request of Fraylon, shortly before the fire found that the work was poor and inferior, and the quality of the material of the new construction of low grade. He estimated that the property was worth $6,000 and that it would cost $19,200 to convert the house into four apartments completed with plumbing, wiring, bathrooms and kitchen cabinets.

Clarence Winchester, a real estate and fire insurance agent, who was selected by Fraylon before the fire to collect the rents from the property, placed $10,000 insurance upon the property in January, 1953. He valued the house at that time at $7,000 and placed the insurance at the higher figure because of the additional work in contemplation.

Under all of these circumstances, it is our judgment that a liberal estimate of the value of the property at the time of the fire was $8500.

The judgment of the District Court will therefore be modified and the case remanded in order that a judgment for the plaintiff be entered on the basis of this valuation.

Modified and remanded.