ENGLISH W. SHIELDS v. NATIONWIDE MUTUAL FIRE INSURANCE COMPANY

No. 8217SC280

(Filed 5 April 1983)

1. **Insurance § 121— fire insurance claim—overvaluation by insured**

Whether the insured has willfully misrepresented a material fact in a fire insurance claim is generally for the jury, and mere overvaluation by the insured, absent a showing of bad faith, does not constitute willful misrepresentation so as to avoid the policy.

Shields v. Nationwide Mut. Fire Ins. Co.

**2. Insurance § 121— fire insurance claim—misrepresentation or false swearing—jury question**

Although the evidence in an action to recover under a fire insurance policy showed that plaintiff frequently and without satisfactory explanation contradicted himself regarding the total value of the burned building, estimated the value of his refurbishing without records to prove his expenditures when by his own admission he did not know the amount spent, and offered a version of his dealing with another insurance company which directly contradicted that of the agent involved, the evidence did not establish as a matter of law that plaintiff willfully concealed or misrepresented a material fact or committed any false swearing in his claim so as to avoid the policy but presented a jury question on that issue.

**3. Evidence § 56— expert appraisal testimony—survey of damages conducted by employees**

In an action to recover under a fire insurance policy, an appraiser's testimony and a written appraisal were properly admitted in evidence where the appraiser testified that his employees conducted a survey of damages under his supervision and control, that he reviewed their work for accuracy and completeness, and that he had visited the site at some point and was personally familiar with the damages to the property, and where the written appraisal was compiled by the appraiser and his employees based on the survey of damages which the appraiser supervised and by reference to an appraisal publication used throughout the appraisal industry, since the evidence established that the appraiser's information was within his personal knowledge though not entirely derived from matters personally observed.

**4. Witnesses § 5.1— unexecuted promissory note—competency for corroboration**

In an action to recover under a fire insurance policy, the admission of a photocopy of an unexecuted promissory note by which plaintiff agreed to pay the balance of the purchase price for the insured building to his predecessor in title merely corroborated the testimony of plaintiff and his predecessor in title and could not, in itself, constitute prejudicial error.

**5. Witnesses § 8.3— source of opinion testimony—refusal to permit cross-examination—absence of prejudice**

In an action to recover under a fire insurance policy, defendant was not prejudiced by the trial court's sustention of an objection to a question asked plaintiff on cross-examination, after plaintiff had given his opinion of the fair market value of his building before the fire, as to who told plaintiff "to testify to that," since the unexplained discrepancies in plaintiff's pretrial and trial opinions of the value of his building were fully exposed by rigorous cross-examination.

**6. Witnesses § 8.3— fire insurance—authorization to stipulate that fire was set—refusal to permit cross-examination**

In an action to recover under a fire insurance policy, the trial court did not abuse its discretion in refusing to permit defendant to ask plaintiff on cross-examination whether he had authorized his attorney to stipulate "that the fire was a set fire" where defendant did not contend that plaintiff set the

Shields v. Nationwide Mut. Fire Ins. Co.

fire himself and the relevance of the information sought as to his authorization of his attorney was thus marginal.

**7. Rules of Civil Procedure § 43; Witnesses § 6.3— impeachment of hostile witness—failure to ask court to rule that witness was hostile**

When a witness in a civil case is "unwilling or hostile" within the meaning of G.S. 1A-1, Rule 43(b), counsel has a right to ask leading questions and to impeach the witness, but the determination of who falls within the coverage of Rule 43(b) is for the court. Therefore, where defendant did not ask the court to rule that a witness was "unwilling or hostile" and he was not such as a matter of law, there was no error in the trial court's refusal to permit defendant to impeach the witness with questions regarding prior criminal convictions.

**8. Witnesses § 6— questions about insurance—admissibility to show bias**

In an action to recover under a fire insurance policy, cross-examination of the agent who placed the policy as to whether he had errors and omissions coverage and the amount of the deductible thereon was admissible to show bias or financial interest on the part of the witness.

APPEAL by defendant from *Albright, Judge.* Judgment entered 12 November 1981 in Superior Court, ROCKINGHAM County. Heard in the Court of Appeals 20 January 1983.

Plaintiff brought this action, pursuant to a fire insurance policy issued by defendant, seeking to recover for a loss sustained from a fire on the insured property. The issues, and the jury's answers thereto, were as follows:

1. Did the plaintiff willfully conceal or misrepresent any material fact or circumstance or commit any false swearing concerning his claim under the policy of insurance issued by the defendant?

ANSWER: NO

2. Did the plaintiff burn or procure the burning or willfully increase the risk of the hazard of fire to the building insured by the defendant?

ANSWER: NO

3. What amount, if any, is the plaintiff entitled to recover of the defendant?

ANSWER: $93,408.22

Defendant appeals from a judgment for plaintiff in the amount of the verdict plus interest.

*Griffin, Deaton & Horsley, by William F. Horsley, for plaintiff appellee.*

*Petree, Stockton, Robinson, Vaughn, Glaze & Maready, by W. Thompson Comerford, Jr., Grover G. Wilson, and Michael L. Robinson, for defendant appellant.*

WHICHARD, Judge.

## I.

Defendant assigns error to denial of his motions for directed verdict and judgment notwithstanding the verdict. The jury found that "plaintiff [did not] willfully conceal or misrepresent any material fact or circumstance or commit any false swearing concerning his claim under the policy of insurance issued by the defendant." Defendant argues that the evidence establishes such misrepresentation as a matter of law, and that this issue thus should not have been submitted. We disagree.

## A.

The policy included the following clause:

This entire policy shall be void if, whether before or after a loss, the insured has wilfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto.

This clause is included in the statutory form for standard fire insurance policies, G.S. 58-176(c), and is read into every such policy even if not expressly stated therein. *Dale v. Insurance Co.,* 40 N.C. App. 715, 716-17, 254 S.E. 2d 41, 42, *disc. rev. denied,* 297 N.C. 609, 257 S.E. 2d 217 (1979).

In construing such a clause, the Fourth Circuit Court of Appeals, in *Globe & Rutgers Fire Ins. Co. v. Stallard,* 68 F. 2d 237 (4th Cir. 1934), said:

The policy is avoided not only for fraud, but also for false swearing by the insured touching any matter relating to the insurance or the subject thereof . . . . [T]he condition against false swearing is broken when a false oath is knowingly and

willfully made by the insured as to any matter material to the insurance or the subject thereof. It is said in some of the cases that same must be made with intent to deceive or defraud. [Citations omitted.] But, . . . the intent to deceive and defraud is necessarily implied in the intentional and willful making of a false statement as to a material matter.

*Id.* at 240.

Mere overvaluation by the insured, without more, will not avoid the policy.

[T]here can be no question but that . . . knowing and intentional overvaluation in the sworn proofs of loss avoids the policy under the clause against false swearing. [Citations omitted.] Of course, honest mistake will not avoid the policy; and to preclude recovery the overvaluation must be of a material character and must have been knowingly and intentionally made. . . . [O]rdinarily, where there is evidence from which intentional overvaluation may be inferred, the question whether it was intentional and with intent to deceive or defraud is . . . for the jury.

*Id.* at 240-41.

It is clear that to deny the recovery of the amount solely on account of an overvaluation of the building when it only represented [the plaintiff's] *bona fide* opinion or estimate would constitute a forfeiture of his right—a very dangerous and severe penalty to inflict in the absence of satisfactory proof that he knew that he was filing a false claim with a bad motive.

*Fraylon v. Royal Exchange Assurance,* 131 F. Supp. 676, 679 (M.D.N.C.), *modified on other grounds,* 228 F. 2d 351 (4th Cir. 1955).

Although criminal actions under G.S. 14-214 cannot establish the standard for judging misrepresentation in civil actions, they do provide guidance. In *State v. Fraylon,* 240 N.C. 365, 82 S.E. 2d 400 (1954), the defendant-insured "made various contradictory statements as to the value of his property." *Id.* at 372, 82 S.E. 2d at 405. The Court noted that

> [w]here the facts are available to all parties, the question as to the value of a damaged building at the time of a fire resolves itself largely into a matter of opinion by qualified witnesses. "Value is necessarily a matter of judgment, and, furthermore, a matter of judgment in which each person is prone to err in overestimating his own. Of course, overvaluation is an evidence of fraud, but it does not amount to fraud where it expresses the *bona fide* opinion of the insured."

*Id.*

[1] The foregoing establishes that whether the insured has wilfully misrepresented a material fact is generally for the jury; and that mere overvaluation, absent a showing of bad faith, does not constitute wilful misrepresentation. Defendant contends, however, that plaintiff's wilfullness and bad faith is conclusively established by his pattern of conduct in exaggerating the value of the insured building. It relies in part on *Lykos v. American Home Ins. Co.*, 609 F. 2d 314 (7th Cir. 1979) (per curiam), *cert. denied,* 444 U.S. 1079, 100 S. Ct. 1030, 62 L.Ed. 2d 762 (1980), where the Court held the evidence established plaintiff's fraud and false swearing as a matter of law. *Id.* at 315. Applying Illinois law of fraud, the Court said that

> "[o]rdinarily, fraud and false swearing is a question of fact for the jury, but it becomes a question of law when the insured's misrepresentations cannot in any way be seen as innocent."
>
> . . . .
>
> . . . [T]he evidence conclusively established a consistent pattern of inordinately excessive claims. After . . . giving all reasonable allowance for the possibility of innocent mistake, we are compelled to conclude that the claims were deliberately false. The misrepresentations can in no way be seen as innocent and no reasonable jury could find otherwise.

*Id.* at 315-16.

## B.

[2] Defendant argues that plaintiff made wilful misrepresentations as a matter of law in the following three areas, all of which affect the material issue of value: (1) the fair-market or replacement value of the property, (2) the extent of renovations com-

pleted before the fire, and (3) the willingness of another insurer to write a policy on the property in an amount exceeding plaintiff's claim against defendant. The pertinent evidence in these areas was as follows:

(1) Plaintiff testified that when he bought the property for $75,000, the building was "in good shape all of the way around." He did not know how much his predecessor had paid for it. He was of the opinion that the value at the time of the fire was $80,000 to $95,000 because of "the way it would rent and the big project coming up." After the fire plaintiff filed a sworn proof of loss stating that the value at the time of fire was $130,000. He claimed $110,000, the full value of the policy.

In documents attached to answers to interrogatories plaintiff alleged that the actual cash value was about $94,000, and the full replacement cost was about $132,000. When questioned regarding the discrepancy between the value he asserted at trial and that in his sworn proof of loss, he explained that the property was worth $85,000 to $90,000 when purchased, but that it "would be worth" $130,000 "when [he] finished with it."

Three or four months after the fire plaintiff told defendant's attorney that the fair market value before the fire was $140,000 to $150,000. When asked to explain his different opinion at trial, he said "maybe it was worth that."

Plaintiff said he did not think he had intentionally misrepresented the value, and "if [he] did [he did not] remember nothing about it," and that his figures "represent [his] best recollection and honest opinion."

The agent who wrote the policy testified that plaintiff requested $110,000 in coverage, and he agreed to that amount. The agent inspected the premises and consulted guidelines provided by defendant before issuing the policy. He signed a pre-trial affidavit in which he stated that he appraised the building at $140,000, offered to insure it for $126,000, and agreed to insure it for $110,000. At trial he testified that he could not remember stating these figures to plaintiff, but that he signed the affidavit because plaintiff insisted that he did so state. He said he was not coerced to sign the affidavit, but that the affidavit figures were not consistent with his opinion of the building's actual cash value.

He felt that he could insure the building for $87,000 plus the amount to be added by plaintiff for renovations.

A real estate appraiser and licensed fire insurance agent testified that the actual cash value of the building at the time of the fire was $12,500. The "estimated reproduction cost new" was listed as $104,788 in his written appraisal. Another insurance appraiser estimated the cost to repair the building at $93,408.

(2) Plaintiff testified that when he purchased the property he planned to spend $16,000 to $18,000 on renovations to convert it into apartments. He never told any representative of defendant that he had actually spent that amount, and it was a mistake or misunderstanding if defendant's representative so understood.

Plaintiff hired four or five men who worked on the building for several weeks before the fire. He paid them in cash and made no record of the payments. He kept receipts of materials he purchased on a nail in the building's foyer, but they were destroyed in the fire. He "could have" spent $10,000 to $12,000 on pre-fire renovations, but did not know since he had no records.

Although plaintiff told defendant's attorney in a pre-trial sworn statement that he had completely rewired the building, at trial he stated that much new wiring had been completed before he purchased it, but that he was going to begin additional new wiring to convert from gas to electric heat. A man began working on the plumbing as soon as plaintiff purchased the building, and plaintiff also hired workers who painted, plastered, sheetrocked, and paneled the walls. In a pre-trial sworn statement plaintiff said he had spent "somewhere in the neighborhood of" $12,000 on painting, sheetrocking, paneling and plastering.

An adjustor for defendant testified that plaintiff told him after the fire that he had spent $18,000 to $20,000 in renovating the building.

A fire investigator testified that if records had been kept in the foyer he could have found remnants of them, since there was relatively little burning in the foyer; and that no nails were found on which the receipts could have been kept.

The agent who wrote the policy testified that, when he toured the building prior to issuing the policy, it "was being com-

pletely remodeled," there was "a small amount" of building materials on the inside but none outside, and workmen were present. Plaintiff told him at that time that he was going to spend about $67,000 on new materials. This played a significant part in his determination of the policy amount, since "it would be added to what [he] felt . . . the value of the building would be at that time before anything was added to it." After the fire plaintiff told the agent the building was ninety per cent complete, but the agent thought little had been done since his pre-fire inspection.

A carpenter hired by plaintiff stated he worked for three weeks and then was told not to return until the plumbing and wiring was completed. He put up sheetrock and paneling, but could not remember how much; and he painted three rooms. While he worked there, he observed old radiators and pipes being removed, and wiring and plumbing work in process. He saw receipts nailed to the walls, although he did not know to whom they belonged.

A junkyard owner testified that he paid plaintiff to be allowed to remove old steam heat radiators and pipes.

A man hired by plaintiff to do plumbing and electrical work testified that when he began all wiring and plumbing had to be redone. At the time of the fire, the wiring and plumbing in four of the nine apartments was at least eighty to ninety per cent complete, and the basement and second floor was stripped and ready to be renewed. Some walls had been painted, paneled and sheetrocked in one apartment.

Plaintiff's grantor testified that "a little bit of work [had been done] all over" at the time he purchased the building. He had several people work on structural roof repairs, wiring, paneling, painting, and sheetrocking. When he finished, a "good portion" of the building had been completely remodeled.

An insurance appraiser testified that he could not tell how much plumbing or wiring was done before the fire; that the wiring was being renewed; that the plumbing was of "below normal" value; and that the building was obviously undergoing repairs, although it appeared that "very little" had been done.

(3) Plaintiff testified that no agent or company had ever refused to issue an insurance policy on his property. He stated

that an agent of one agency offered to write a policy on the building for $200,000 with two different companies. The agent testified that she never offered to write a policy on the property in any amount, and that she specifically refused plaintiff's request to write a policy for $100,000.

## C.

In ruling on a motion for directed verdict, G.S. 1A-1, Rule 50(a), plaintiff's evidence must be taken as true and considered in the light most favorable to him. *E.g., Dickinson v. Pake*, 284 N.C. 576, 583, 201 S.E. 2d 897, 902 (1974); *Clark v. Bodycombe*, 289 N.C. 246, 250, 221 S.E. 2d 506, 509 (1976). All conflicts must be resolved in plaintiff's favor, and he must be given the benefit of every reasonable inference. *E.g., Daughtry v. Turnage*, 295 N.C. 543, 544, 246 S.E. 2d 788, 789 (1978). The same standard applies to a motion for judgment NOV, G.S. 1A-1, Rule 50(b). *Summey v. Cauthen*, 283 N.C. 640, 648, 197 S.E. 2d 549, 554 (1973).

Applying these principles to the evidence here, we find no misrepresentation or false swearing by plaintiff as a matter of law. Although plaintiff frequently and without satisfactory explanation contradicted himself regarding the total value of the building, estimated the value of his refurbishing without records to prove his expenditures when by his own admission he did not know the amount spent, and offered a version of his dealings with another insurance company which directly contradicted that of the agent involved, the evidence does not "conclusively [establish] a consistent pattern of inordinately excessive claims." *Lykos, supra.* Conflicts in the testimony of the various witnesses, and contradictions within plaintiff's own testimony, were for the jury to resolve; and reasonable jurors could find that any misrepresentations were innocent. *Lykos, supra.*

Resolving all contradictions and drawing all inferences in plaintiff's favor, as we must, we hold that defendant's motions for directed verdict and judgment NOV were properly denied.

> The evidence offered by the [plaintiff], if believed by the jury, may have recast [defendant's] . . . evidence in such light as to have diluted its probative force before the jury . . . . Obviously, . . . the jury in its composite wisdom, after hearing the testimony and observing the demeanor of the witnesses,

disbelieved the defendant['s] evidence and resolved the issues
against [it]. The record amply sustains the [decision] . . . .

*State v. Hedrick*, 236 N.C. 727, 731, 73 S.E. 2d 904, 906 (1953)
(criminal action for violation of G.S. 14-214).

## II.

[3]  Defendant assigns error to admission of testimony by an in-
surance appraiser on the grounds that (1) the appraiser had no
personal knowledge of the actual physical damage to the building,
but based his appraisal on inspections by his employees, assump-
tions about the pre-fire condition of the building, and appraisal
publications; and (2) a written appraisal prepared by the ap-
praiser's employees was introduced as his exhibit.

"It is well established that the value of the use of property
may be proved by the opinion evidence of witnesses acquainted
with the property and the facts bearing upon its use." *Perkins v.
Langdon*, 237 N.C. 159, 176, 74 S.E. 2d 634, 647 (1953). "A witness
is not competent to testify to a fact beyond his personal
knowledge or to base an opinion upon facts of which he has no
knowledge." *Robbins v. Trading Post, Inc.*, 251 N.C. 663, 666, 111
S.E. 2d 884, 886 (1960). However, "facts and information within
the personal knowledge of an expert [are not limited] to
knowledge *derived solely* from matters personally observed. . . .
[A]n expert witness has wide latitude in gathering information
and may base his opinion on evidence not otherwise admissible."
*State v. DeGregory*, 285 N.C. 122, 132, 203 S.E. 2d 794, 801 (1974)
(emphasis in original).

The appraiser testified that his employees conducted a
survey of damages "under [his] supervision and control," that he
"review[ed] their work for accuracy and completeness," and that
he had visited the site at some point and was "personally familiar
with the damages to the property." The written appraisal was
compiled by the appraiser and his employees based on the survey
of damages which the appraiser supervised, and by reference to
an appraisal publication "used throughout the appraisal industry"
which was also used by an appraiser testifying for defendant. The
foregoing establishes that the appraiser's information was "within
[his] personal knowledge," though not entirely derived "from mat-
ters personally observed." *DeGregory, supra.* We thus find no er-

ror in admission of the testimony and written appraisal.

Defendant also contends the appraiser's direct testimony was in improper, narrative form. Although it is customary to ask specific questions, *inter alia*, to give opposing counsel an opportunity to object, 1 *Brandis on North Carolina Evidence* § 25, p. 90 (2d rev. ed. 1982), the conduct of the examination is largely in the control of the trial judge, *id.*, and "[we] will not interfere with the exercise of the trial judge's duty to control the conduct and course of a trial absent a showing of manifest abuse." *State v. Covington*, 290 N.C. 313, 335, 226 S.E. 2d 629, 644 (1976). The record here reveals no manifest abuse.

## III.

[4] A photocopy of an unexecuted promissory note, by which plaintiff agreed to pay the balance of the purchase price for the building to his predecessor in title, was admitted over defendant's objection. Defendant contends this instrument was "incompetent to prove that plaintiff had bound himself by a written agreement to pay" his grantor the sum stated therein, and that its admission "prejudiced defendant's case by giving credence and weight to plaintiff's contention that an arm's length transaction had occurred in the purchase of this property."

Defendant's theory was that the transaction was a civil conspiracy to defraud it by raising the property's value artificially pursuant to a "pyramiding" scheme. Both plaintiff and his grantor testified without objection that a document was executed by which plaintiff agreed to pay the grantor about $15,000 as part of the sales transaction. Therefore, admission of the photocopy of the unexecuted instrument merely corroborated their testimony and could not, in itself, constitute prejudicial error.

We find it unnecessary to consider defendant's further argument that admission of the photocopy violated the best evidence rule because (1) both parties to the note acknowledged its existence and terms, thereby negating any prejudice from its admission; and (2) defendant stipulated in the pre-trial conference order that each of plaintiff's proposed exhibits, including the copy of the promissory note from plaintiff to his grantor, "is genuine and, if relevant and material, may be received in evidence without further identification or proof."

IV.

[5]   On cross-examination, after plaintiff had given his opinion of the fair market value of his building before the fire, the court sustained an objection to the following question: "Who told you to testify to that?" It also sustained an objection to a question as to whether plaintiff had authorized his attorney to stipulate "[t]hat this was a set fire." Defendant assigns error to these exclusions.

While opposing counsel has wide latitude in the cross-examination of witnesses, "[t]he wide latitude accorded the cross-examiner 'does not mean that all decisions with respect to cross-examination may be made by the cross-examiner.' [Citation omitted.] Rather, the scope and duration of cross-examination rest largely in the discretion of the trial judge." *State v. Satterfield*, 300 N.C. 621, 627, 268 S.E. 2d 510, 515 (1980). "It is well recognized . . . that the trial judge, who sees and hears the witnesses and knows the background of the case, has a wide discretion in controlling the scope of cross-examination." *State v. Daye*, 281 N.C. 592, 596, 189 S.E. 2d 481, 483 (1972).

The unexplained discrepancies in plaintiff's pre-trial and at-trial opinions of the value of his building were fully exposed by rigorous cross-examination. *See* Part I.B.(1), *supra*. We thus perceive no prejudice from sustention of the objection to the question as to the source of his opinion testimony.

[6]   Defendant has not contended that plaintiff set the fire himself. The relevance of the information sought by the question as to his authorization to his attorney thus was marginal, and the trial judge "has discretion to ban . . . inquiry into matters of only tenuous relevance." *Satterfield, supra*, 300 N.C. at 627, 268 S.E. 2d at 515.

We find no abuse of discretion in the rulings complained of.

V.

Plaintiff, over objection, gave his opinion regarding "whether . . . it would have been possible to get into [the] building without a key," and whether he could have hauled bales of hay into the building. He also stated, over objection, that he had problems with his sense of smell due to emphysema and asthma.

These matters related to the issue of whether plaintiff was responsible for the fire. The jury answered this issue in the negative, and defendant does not contend that its finding is not supported by competent evidence. The errors assigned to admission of this testimony relate, then, to an issue not before us. Further, we perceive no prejudice in the admission.

Plaintiff was asked on direct examination, "Have you been charged with anything in connection with that fire?" Defendant's objection was sustained, and the jury was immediately instructed to disregard plaintiff's negative response. "The court properly instructed the jury not to consider the . . . evidence . . ., and the law presumes the jury followed the judge's instructions." *State v. Long*, 280 N.C. 633, 641, 187 S.E. 2d 47, 52 (1972). The error assigned to this testimony is thus overruled.

## VI.

[7] Defendant called as a witness the predecessor in title to plaintiff's grantor. It contends that, because part ot its trial theory was that plaintiff, his grantor, and this witness conspired to inflate the property's price artificially, the witness "was clearly . . . adverse"; and the court therefore erred in refusing to allow it to impeach him with questions regarding prior criminal convictions.

G.S. 1A-1, Rule 43(b), provides that "[a] party may interrogate any unwilling or hostile witness by leading questions and may contradict and impeach him in all respects as if he had been called by the adverse party." When a witness is "unwilling or hostile" within the meaning of Rule 43(b), counsel has a right to ask leading questions and impeach the witness. Contrary to criminal procedure, in a civil case the right to lead and impeach hostile witnesses does not depend upon the discretion of the trial judge. See *Ingram, Comr. of Insurance v. Insurance Agency*, 303 N.C. 287, 290-91, 278 S.E. 2d 248, 251 (1981).

Determination of who falls within the coverage of Rule 43(b) is, however, for the court. *"When the judge finds that a witness falls within this provision*, impeachment is a matter of right rather than discretion." 1 *Brandis on North Carolina Evidence* § 40, p. 154 (2d rev. ed. 1982) (emphasis supplied). Defendant did not ask the court to rule that the witness was "unwilling or

hostile," and we decline to hold that he was such as a matter of law. Under these circumstances we find no error in the exclusion complained of.

## VII.

[8] Defendant assigns error to the following from cross-examination of the agent who placed the policy:

Q. Now Mr. Zanetti, I think that it is fair to say that you have something of a financial stake in this law suit, don't you?

A. Yes, sir.

MR. COMERFORD: Objection.

COURT: Overruled.

EXCEPTION NO. 41

Q. In fact there is a gentleman back here that is a counsel for your errors and [omissions] carrier isn't there?

MR. COMERFORD: Objection.

COURT: Sustained.

Q. Have you been told there is going to be a claim following this one in the event Mr. Shields recovers?

MR. COMERFORD: Objection.

COURT: Sustained.

EXCEPTION NO. 42

Q. Do you have errors and [omissions] coverage?

A. Yes, I do.

Q. What is the deductible amount on that?

MR. COMERFORD: Objection.

COURT: Overruled.

EXCEPTION NO. 43

A. Now or then?

Q. Then?

A. Two hundred and fifty.

Q. So the first two hundred and fifty dollars comes out of your pocket, is that right?

 MR. COMERFORD: Objection.

 COURT: Overruled.

 EXCEPTION NO. 44

A. Yes, sir.

Defendant argues (1) that by analogy to liability insurance in a negligence action, the mention of errors and omissions coverage led the jury to believe ultimate responsibility would fall on some entity not a party to the action; and (2) that any personal liability of the agent was entirely speculative since the questions assumed that the errors and omissions carrier would be sued and would be liable.

Evidence of insurance coverage is generally inadmissible in negligence suits. *E.g.*, *Fincher v. Rhyne*, 266 N.C. 64, 68-69, 145 S.E. 2d 316, 318-19 (1965). It is admissible, however, "if it has some probative value other than to show the mere fact of its existence." *Siedlecki v. Powell*, 36 N.C. App. 690, 697, 245 S.E. 2d 417, 422 (1978); *see* 1 *Brandis, supra*, § 88.

This is not a negligence action, and the above rule of exclusion is thus inapplicable. Further, the evidence was admissible to show bias or financial interest on the part of the witness. *See Bryant v. Furniture Co.*, 186 N.C. 441, 445, 119 S.E. 823, 825 (1923); *Siedlecki, supra;* 1 *Brandis, supra*, § 88.

No error.

Judges ARNOLD and HILL concur.