STATE OF NORTH CAROLINA v. JAMES E. JOHNSON, JR., ALBERT S. KILLINGSWORTH AND WIFE, ELIZABETH E. KILLINGSWORTH, HUGH M. MORTON AND WIFE, JULIA T. MORTON AND SOUTHERN NATIONAL BANK OF NORTH CAROLINA

No. 55

(Filed 11 October 1972)

1. Eminent Domain § 6— fair market value — uses of the property

In determining fair market value in condemnation proceedings, the essential inquiry is, "what is the property worth in the market, viewed not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted—that is to say, what is its worth from its availability for all valuable uses?"

2. Eminent Domain § 6— value of land adaptable to subdivision

In appraising an undeveloped tract of land which is adaptable to subdivision, the question is not what the tract might be worth if subdivided and sold as improved lots but what it was worth in the open market in its existing condition on the day of the taking.

3. Eminent Domain § 6— maps showing proposed subdivision — illustrative purposes — prejudicial error

In a proceeding to determine the value of 268.5 acres of land condemned by the State adjacent to Confederate Fort Fisher, the trial court committed prejudicial error in the admission for illustrative purposes of two maps showing a proposed subdivision of the condemned property for resort residential use and proposed motel, marina and office sites, where the State did not contend that the land was not adaptable to resort residential use, and the trial court failed to give the jury positive instructions that it could not value the land on a per-lot basis and an explanation of why it would be improper to do so.

State v. Johnson

4. **Eminent Domain § 6— undeveloped land — conditional sale of proposed subdivision lots — evidence of value of condemned land**

In a proceeding to determine the value of undeveloped land condemned by the State, the trial court committed prejudicial error in the admission of evidence of conditional sales by respondents of eight acres of the land condemned, embracing twenty lots in a proposed subdivision of the land, for $160,000, the deeds and purchase money having been placed in escrow to be delivered only when the proposed subdivision was completed, since the transactions do not disclose what the buyers would have been willing to pay for the property as it was on the date of the purported sales.

5. **Eminent Domain § 6— value of undeveloped land — sales price of other developed land**

In this proceeding to determine the value of undeveloped land condemned by the State adjacent to Confederate Fort Fisher, the trial court erred in permitting respondents, on cross-examination of a State's expert witness, to elicit testimony that lots fronting 200 feet on the ocean and extending back 100 feet on the developed portion of Shell Island had been sold for $15,000, as there was no evidence which would make values on Shell Island evidence of the value of the condemned property, and the only purpose in eliciting the testimony was to induce thereby a liberal award.

6. **Eminent Domain § 6— value of condemned land — sales price of similar land**

The price paid at voluntary sales of land, similar in nature, location and condition to the condemnee's land, is admissible as independent evidence of the value of the land taken if the prior sale was not too remote in time; whether two properties are sufficiently similar to admit evidence of the purchase price of one as a guide to the value of the other is a question to be determined by the trial judge in the exercise of a sound discretion.

7. **Eminent Domain § 6— value of condemned property — condemnor's purchase price for other property for same project — inadmissibility**

Evidence of the price paid by the condemnor in purchasing neighboring property for the same project is inadmissible to prove the value of the condemned land, no matter how similar the lands may be, as the sale to a prospective condemnor is highly unlikely to be a fair test of market value.

8. **Eminent Domain § 6— value of condemned property — evidence of proposed uses**

The trial court in a condemnation proceeding committed prejudicial error in permitting one of the owners to testify that "at a future date" the owners "proposed" to construct a marina, a motel and condominiums on the condemned property.

9. **Eminent Domain § 6— value of condemned property — evidence that streets had been rough graded — prevention of subdivision**

In a proceeding to determine the value of 268.5 acres of land

State  v.  Johnson

condemned by the State, it was competent for the owners to show that, on the day of the taking, streets had been rough graded and surveyor's control stakes placed on 28.5 acres as initial steps in laying out a subdivision on that portion of the condemned property, since (1) the evidence tended to show that such area was adapted to use as a residential subdivision, and (2) the grading work was a part of the overall condition of the land when taken and one factor to be considered in determining the value which that area had at that time for development as a residential subdivision; however, the value of the property was not augumented because the condemnation proceeding prevented the owners from carrying out their plans to develop a subdivision.

10. Eminent Domain § 5— amount of compensation — character of landowner

The character of a landowner is irrelevant to his right to receive just compensation when his land is taken by the State.

11. Witnesses § 5— character evidence for corroborative purposes

Until the credibility of a party who has testified in his own behalf has been impeached by imputations of bias, inconsistencies in his statements, or otherwise, his good character may not be proved to corroborate his testimony.

12. Eminent Domain § 7— condemnation proceeding — instructions as to character of owners — error

The trial judge in a condemnation proceeding in effect made himself a character witness for the owners and thereby bolstered the credibility of the testimony of one of the owners when he instructed the jury that the owners appeared to be "fine high quality citizens, good people and they are entitled to just compensation."

13. Eminent Domain § 7— condemnation proceeding by the State — instructions on shortcomings on part of State — error

In a condemnation proceeding instituted by the State, the trial court erred in instructing the jury that it behooves all citizens and governmental agencies to strive constantly to overcome any short-comings on the part of the State, as such instruction carried the implication that the State had not dealt fairly with respondents and suggested that the jury should right the wrong.

14. Costs § 4— expert witness fees — necessity that witnesses be subpoenaed

The trial court was without authority to allow expert fees to respondents' witnesses who testified without having been subpoenaed or to tax the State with the costs of their attendance. G.S. 7A-314(a) and (d).

Justice HIGGINS concurs in result.

Justice MOORE took no part in the consideration or decision of this case.

APPEAL by the State from *James, J.,* 8 November 1971 Session of NEW HANOVER, transferred from the Court of Appeals for initial appellate review by the Supreme Court pursuant to G.S. 7A-31(a) (1969); docketed and argued as Case No. 127 at the Spring Term 1972.

This proceeding was instituted by the State on 28 June 1968 under N. C. Gen. Stat., Ch. 146, Art. 6 (1964 and Supp. 1971), in the manner prescribed by Chapter 136, Art. 9, to condemn 268.5 acres of land owned by respondents Johnson and Killingsworth. The purpose of the condemnation is to preserve the remains and relics of Confederate Fort Fisher and the approaches thereto.

The property condemned is shown on a map entitled "Map Showing a Portion of Fort Fisher," introduced in evidence as State's Exhibit A. This map shows the land to be a rough Y in shape, the base of the Y being the northern end of the tract and the western prong about one-half as long as the eastern. The northern boundary of the tract is a 667-foot line which was the southern boundary of an 11.51-acre tract purchased by the State in 1966 from Hugh Morton. (On the Morton tract is located over half of the small area known as Battle Acre. This area, which was within the ell of the old fort and the site of Colonel William Lamb's headquarters, is marked by a monument. The remains of the sea face of Fort Fisher extend southward about one mile from the angle with the land face near Battle Acre.) U. S. Highway No. 421 crosses the base of the Y, cutting off a triangle about 200 x 200 x 100 feet from the extreme northwestern corner of the property. The eastern line of the property runs approximately 11,000 feet along the Atlantic Ocean. The width of the eastern prong of the Y at its south terminus is approximately 550 feet. Between the east and west prongs are marshlands and Stillwater Bay. The inside of the Y, an irregular V in shape, is approximately 12,600 feet from the southwestern terminus of the eastern prong to the southeastern terminus of the western prong.

The last 600 feet of the south end of the west prong varies from 100 to 200 feet in width. At the base of this strip the prong is approximately 555 feet wide. The map shows the western line of the property, the right side of the Y, to be 5,900 feet in length. This line coincides with the "U. S. Government Taking Line," a line established by the federal government as

"a protection line in case of explosion" at its Sunny Point Ammunition Depot. The described property all lies above the mean high water lines of the sound and the ocean as shown on Exhibit A. Generally the elevation of the land is 5-6 feet above mean high water, the northern portion being higher than the southern.

On 11 May 1970, Judge Albert W. Cowper, pursuant to G.S. 136-108 (1964), determined the conflicting claims to the property and all other issues raised by the pleadings except the amount which the State should pay the owners as just compensation for the taking. Upon appeal, his judgment was modified and affirmed by this Court in *State v. Johnson,* 278 N.C. 126, 179 S.E. 2d 371 (1971). Following certification of that decision, which settled the southern boundary of the east prong of the Y as the line along which New Inlet had closed in 1933, the parties stipulated the location of this line to be the New Inlet line shown on State's Exhibit A. Illustrative map No. 1, drawn from Exhibit A and inserted herein, shows the boundaries of the property taken.

At the time the State filed the declaration of taking it deposited in court the sum of $237,500.00 as its estimate of just compensation for the 268.5 acres condemned. At the trial before Judge James the sole issue was the fair market value of this land on 28 June 1968, the date of the taking. The jury answered the issue, "$1,262,500.00."

Respondents' evidence of value ranged from one appraiser's low of $1,762,000.00 to respondent Killingsworth's high estimate of $4,027,500.00. The State's evidence of value ranged from a low of $225,000.00 to a high of $300,000.00. Respondents had purchased the 268.5 acres in suit on 5 July 1967 from Hugh Morton. As a witness for the State, Mr. Morton testified that he sold the property to respondents for $225,000.00 after it had been advertised for about five months in the State's major newspapers and also in the Wall Street Journal.

In addition to opinion evidence as to value, respondents offered evidence tending to show:

After purchasing the property respondents employed land planners and engineers to advise them with reference to the highest and best use, which was determined to be a residential development along the ocean and sound. Over the State's ob-

jection, respondent Killingsworth testified that, as a result of this advice, respondents planned at some future time (1) to use eight acres at the north end of the property for a motel; and (2) as an adjunct to residential development, to construct a marina on the south end of the western prong of the Y.

In March 1968 respondents employed the engineering firm of Moorman and Little, Inc., to subdivide 28.5 acres in the northeast portion of the property for a residential development. That firm worked on the project from then until 28 June 1968, when all work stopped. On the date of the taking, Moorman & Little had "developed and computed" for this acreage the lot plan shown on the map denominated "Section One, Ramsgate at Fort Fisher" (Section One). Over the State's objection, this map was introduced in evidence as Respondents' Exhibit B to illustrate the testimony of certain witnesses. It showed 79 lots, which fronted on six east-west streets stemming from two connecting north-south streets. These streets constituted one continuous thoroughfare on the western boundary of Section One. Each of the six east-west streets ended in a circle. (See Illustrative Maps 2 and 3.)

On 6 June 1968, approximately three weeks before the taking, respondents executed to Michel DeLoach, a first cousin of respondent Killingsworth, a deed for about four acres of the 28.5-acre tract. Although it contained no reference to the subdivision or to the map of it, the description in the deed actually covered the ten lots comprising the northeast corner of Section One. The consideration for this deed was $80,000.00. However, both money and deed were deposited in escrow with the Wachovia Bank & Trust Company at Wilmington to be delivered if, and when, respondents completed the subdivision in accordance with the engineering plans for its development.

At the same time—upon the same conditions, for the same consideration, and in the same manner—respondents executed a deed for an additional four acres of Section One to Del-Cook Lumber Company (Del-Cook), a corporation in which DeLoach was a minority stockholder. The metes and bounds description in this deed covered the ten lots at the southeast corner of Section One, but it likewise made no reference to the subdivision or map.

Prior to the execution of these two deeds Killingsworth had received a telegram from the State's Property Officer asking

State  v.  Johnson

respondents to stop all grading upon the land. At the time the deeds were executed respondents, DeLoach and Del-Cook, all had notice of the State's interest in acquiring the property in suit. When the institution of this condemnation proceeding made compliance with the conditions of the sale impossible, the bank returned the money to DeLoach and Del-Cook and the deeds to respondents.

The court found that these two "sales transactions" took place at arm's length in the ordinary course of business and, over the State's objection, admitted the testimony of respondent Killingsworth, detailed above, with reference thereto.

On 28 June 1968, the date of the taking, only the improvements planned for Section One had been started, and they were incomplete. No lots had been staked out on the ground, for property irons could not be placed until the last of the grading had been completed. However, streets had been rough graded and control stakes put in. Although the streets were ready for marl, the stone base for asphalt, no marl had been placed on the streets. Drainage ditches and culverts were still to be constructed. No drainage pipes had been put in the ground, but water laterals across the streets were in. The main drainage project, a canal approximately six feet deep and 3,000 feet long, which was to run along the western boundary of the Y abutting the U. S. Government taking line, had not been commenced. The underground electrical system had not been installed. Because soil conditions were suitable for septic tanks there was no sewage disposal plan. Moorman testified that a sewage plan "was not necessary in the first phase." A well site of approximately 200 square feet had been selected, but no well had been constructed.

On 5 June 1968 the Wilmington-New Hanover Planning Board gave conditional preliminary approval to the layout of this subdivision. This approval authorized the construction of streets, the installation of water systems and other utilities, but until the county commissioners finally approved the plans for the subdivision no sales could be made with reference to the map, Exhibit B. This final approval was dependent upon respondents meeting the requirements of the zoning ordinance and of the Board of Health. Final approval had not been obtained at the time of the taking.

In addition to Section One, Moorman & Little had put on paper a preliminary plan for Section Two of Ramsgate. Over the State's objection, to illustrate the testimony of their witness Moorman, respondents were permitted to introduce in evidence a map, identified as respondents' Exhibit C. This map incorporated State's Exhibit A and superimposed upon it the 79 lots of Section One as shown by Exhibit B. Also superimposed upon Exhibit C in dotted lines was the preliminary plan for Section Two. This proposed subdivision of 106 lots was shown as adjoining Section One on the west and extending southwardly across the western prong of the Y. Exhibit C was placed on the wall and, in the course of his testimony, Moorman was allowed to point out Section Two to the jury. Later it was used to illustrate the testimony of respondents' witnesses Taylor, Kepley, and Stout.

Illustrative Map No. 2, inserted herein, is drawn from respondents' Exhibit C. It shows the details essential to an understanding of that exhibit. Illustrative Map No. 3 shows on a larger scale than was possible on Map No. 2 that portion of Exhibit C which incorporated Section One (respondents' Exhibit B) and proposed Section Two (Ramsgate Preliminary).

In addition to Sections One and Two, Exhibit C also showed three separate tracts of land adjacent to the 268.5 acres on the north. These tracts, which the State had previously acquired by purchase, extended the stem of the Y northwardly along the Atlantic Ocean.

Tract No. 1, which immediately adjoins the land in suit, was purchased by the State from Morton on 18 January 1966. It contains 7.513 acres exclusive of the 3.997 embraced within the highway right-of-way and the portion of Battle Acre located thereon. Tract No. 2, which adjoins Tract No. 1, was purchased from Bessie Orrell on 5 July 1963. It contains 11.215 acres exclusive of the 4.077 acres covered by the right-of-way and the remaining portion of Battle Acre. Tract No. 3, which adjoins Tract No. 2, was purchased from Orrell on 14 July 1970. It contains 10.26 acres exclusive of the highway right-of-way of .75 acres. U. S. Highway 421 traverses each of the tracts.

When respondents attempted to show by the witness Julien K. Taylor that these tracts were comparable to the property in suit, and that the price paid for each was competent evidence

State  v.  Johnson

ILLUSTRATIVE MAP
No. 1

State  v.  Johnson

STATE OF NORTH CAROLINA
VS.
KILLINGSWORTH & JOHNSON, ET ALS

GENERAL AREA AND PROJECT MAP PRE-
PARED FOR KILLINGSWORTH & JOHNSON
BY PARTIAL SURVEYS & USC & GS MAPS

ILLUSTRATIVE MAP
NO.-2

State  v.  Johnson

ILLUSTRATIVE MAP No.-3

bearing upon the value of the 268.5 acres, the court conducted a *voir dire*. Respondents' evidence on *voir dire* tended to show:

The three tracts were "comparable properties in the sense that they are in the same proximity and they are facing the same ocean and the same latitude," as the acreage in suit. The three tracts, however, have no back water and are considered a mainland beach. Both Orrell tracts and the northern part of the Morton tract have a somewhat higher elevation than the respondents' property. They are closer to already developed Kure Beach, which has a readily available water and sewage system. All are traversed by a paved highway, No. 421. Tract No. 1 has a frontage of approximately 1,700 feet on U. S. 421; the subject property, only 400 feet. Tract No. 2 has a road frontage of 2,400 feet and Tract No. 3, a frontage of 1,004 feet. The evidence further showed that since 1963 the market value of beach property had steadily increased; and that smaller tracts, for which there are more buyers, commanded disproportionately higher prices than larger tracts, which were ordinarily sold by the acre.

The State elected to offer no evidence on the *voir dire* but later, before the jury, it offered evidence tending to show that the three tracts were not comparable to the land in suit.

At the conclusion of the *voir dire,* counsel for respondents inquired whether the State would offer evidence that it acquired the three tracts under a threat of condemnation. The State's reply was that, "It is not necessary to do so and we don't propose to do it."

Judge James held the three tracts "sufficiently comparable in location and terrain and in proximity to the subject land" to render the sales prices admissible in evidence. The State excepted and, over its objection, respondents offered evidence that the purchase price of the Tract No. 1 was $38,000.00, or approximately $5,058.00 per acre; Tract No. 2, $60,000.00, or approximately $5,349.00 per acre; and Tract No. 3, $100,000.00, or approximately $9,746.00 an acre.

In addition to the opinion, evidence as to value set out above, before the jury the State offered and elicited evidence tending to show:

Tracts Nos. 1, 2, and 3 are not comparable properties. The two Orrell tracts differ both in elevation and accessibility. The

Morton tract, although it has good frontage on a paved highway and is surrounded by land having a higher elevation, has suffered severe erosion over the years. The land in the vicinity of Battle Acre is low beach land. Within the memory of the witnesses two or three inlets have opened and crossed the land taken. At the present time the beach on the eastern prong of the Y is building up, but notwithstanding, an inlet might cut through the eastern prong at any time.

Appraisers for the State agreed with appraisers for respondents that smaller tracts of beach property tend to bring much higher prices than larger tracts and that generally a small tract has a higher per unit cost than a larger tract. R. C. Cantwell III, an expert witness for the State, testified that "the subject land is grossly larger than the three tracts which the State purchased from Morton and Orrell" and that, because of the disparity in size, the three tracts are basically incomparable. "It is," he said, "like comparing pork chops with a pig. By that I mean a pig will normally sell on the market for maybe twenty cents. We go to a restaurant and buy a pork chop for maybe two or three dollars. A pork chop is a subdivision of a pig." In any subdivision of land "there would be losses for triangulation or misshaped lots and that sort of thing." Mr. Cantwell valued the property taken at $300,000.00.

Other evidence for the State tended to show that the northern 35-40 acres of the land taken (the base of the Y) is "high and usable" for development as "resort residential"; that it has a value of $5,000.00 per acre; that the remaining acreage "going south" would require dredging and filling "at a great deal of expense" before it would be suitable for development; and that its value is not over $400.00 per acre.

On cross-examination of Cantwell, over the State's objection, respondents elicited evidence that lots fronting 200 feet on the ocean and extending back 100 feet on the *developed* portion of Shell Island, a development near Wrightsville Beach, had been sold for $15,000.00 per lot and that only four such lots remained unsold.

From the judgment entered on the verdict the State appealed, assigning errors in the admission of the evidence and in the charge.

State v. Johnson

*Attorney General Morgan; Assistant Attorney General Costen; and Staff Attorney Evans for the State.*

*Marshall, Williams, Gorham & Brawley for Killingsworth and Johnson, respondent appellees.*

SHARP, Justice.

The State assigns as error, *inter alia*, the admission into evidence of (1) respondents' Exhibits B and C; (2) testimony that respondents had sold eight acres of the land condemned, embracing twenty lots of Section One, for $160,000.00; (3) testimony that lots in a development on Shell Island were selling for $15,000.00 each (Exceptions 137-145); (4) the price which the State paid for three small tracts adjacent to the land taken; (5) testimony tending to show respondents' plans for the future use of the property taken; (6) a portion of the charge with reference to the character of respondents; (7) the court's order allowing expert witness fees to four of respondents' witnesses. (The foregoing enumeration is ours for convenience of discussion.)

The State's contentions with reference to assignments (1)-(3) are that the development of Ramsgate was still in the embryonic stage; that the challenged evidence, which tended to portray it and to value it as a finished subdivision, caused the jury to assess damages in excess of just compensation. Respondents contend that under the decisions of this Court Exhibits B and C were competent to illustrate the testimony, and that "no value on a per lot basis was stated or suggested by any witness."

[1] In condemnation proceedings, the well established rule is that in determining fair market value the essential inquiry is, "what is the property worth in the market, viewed not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted— that is to say, what is it worth from its availability for all valuable uses?" *Barnes v. Highway Commission,* 250 N.C. 378, 387, 109 S.E. 2d 219, 227 (1959). The following very perceptive comment on this rule appears in 4 Nichols, *The Law of Eminent Domain* § 12.3142(1) (3rd ed. 1971) (hereinafter cited as Nichols) :

"The most characteristic illustration of the rule that market value is not limited to value for the existing use and the

situation in which [the rule] is most frequently invoked *(and also most frequently abused)*, is where evidence is offered of what the value of a tract of land that is used for agricultural purposes (or is vacant and unused) would be if cut up into house lots. It is well settled that if land is so situated that it is actually available for building purposes, its value for such purposes may be considered, even if it is used as a farm or is covered with brush and boulders. The measure of compensation is not, however, the aggregate of the prices of lots into which the tract could be best divided, since the expense of clearing off and improving the land, laying out streets, dividing it into lots, advertising and selling the same, holding it and paying taxes and interest until all the lots are disposed of cannot be ignored and is too uncertain and conjectural to be computed." (Emphasis added.)

[2] The last two sentences of the foregoing quotation from Nichols were quoted, and accepted as the law of this State, in *Barnes v. Highway Commission, supra* at 388-389, 109 S.E. 2d at 228. To further amplify the rule, Justice Clifton L. Moore, writing for the Court added: "It is proper to show that a particular tract of land is suitable and available for division into lots and is valuable for that purpose, but it is not proper to show the number and value of lots as separated parcels in an imaginary subdivision thereof. In other words, it is not proper for the jury in these cases to consider an undeveloped tract of land as though a subdivision thereon is an accomplished fact. Such undeveloped property may not be valued on a per lot basis. The cost factor is too speculative." *Id.* at 389, 109 S.E. 2d at 228. *Accord, Highway Commission v. Conrad,* 263 N.C. 394, 139 S.E. 2d 553 (1965). Thus, in appraising an undeveloped tract of land which is adaptable to subdivision, the question is not what the tract might be worth if subdivided and sold as improved lots but what it was worth in the open market in its existing condition on the day of the taking. *Northern Indiana Public Service Co. v. McCoy,* 239 Ind. 301, 157 N.E. 2d 181 (1959).

In *Barnes,* the Highway Commission took 12.19 acres of the petitioners' 46.86-acre tract for a limited access highway (expressway), and the petitioners brought a proceeding to obtain compensation. After the taking they had a civil engineer to make two maps of the property. One, made without reference to the expressway, showed a residential subdivision contain-

ing streets and 86 building lots. The other showed the express-way, streets, and 62 lots. At the trial, the petitioners offered the maps as substantive evidence that the land was capable of being subdivided into residential lots. The Commission's objection was sustained.

Later, after an expert realtor had testified that the property, both before and after the taking, was adaptable to practical residential subdivision, the judge admitted the maps to illustrate and explain the testimony of the witness. He excluded testimony as to the value of the property based on the number of lots before and after taking and the value per lot, less estimated cost of subdividing and developing. Disappointed in the verdict, *the petitioners* appealed, assigning as error the judge's refusal to admit the two maps as *substantive* evidence and to permit the undeveloped property to be valued on a per-lot basis. This Court held that the maps were properly excluded as substantive evidence and that the property could not be valued on a per-lot basis.

Although the Highway Commission had not appealed and no assignment of error challenged the use of the maps of the two "supposed subdivisions" for the purpose of illustrating the testimony of the witnesses, there appears in the opinion "a remark by the way" that "the maps showing subdivisions were relevant and competent to illustrate and explain the testimony as to the possibility and manner of subdividing . . . , " *id.* at 390, 109 S.E. 2d at 229, and that "petitioners had the full benefit of the maps upon those phases of the case to which they properly pertained." *Id.* at 391, 109 S.E. 2d at 229. Clearly this remark was *dictum.*

In *Highway Commission v. Conrad, supra,* the landowner offered in evidence a map showing a proposed subdivision of condemned property upon which no improvements had been made and no lots laid out. The map was offered for the purpose of illustrating testimony that the highest and best available use of the land was for a residential subdivision. The trial judge excluded the map. On appeal his ruling was affirmed because (1) there was no showing that the map was prepared by an engineer from an actual survey; (2) there was no contest as to the best and highest capability of the property; and (3) the jury had viewed the premises. Justice Moore, again

writing the Court's opinion, said that "under proper circumstances" a map of a proposed subdivision is admissible to illustrate and explain the testimony of witnesses as to the highest and best use of the property and to show that it is capable of subdivision; that the trial judge, in his discretion, may admit or exclude such evidence in accordance with the particular circumstances presented. He was careful to point out, however, that "such map should not be admitted where it is calculated to mislead the jury into allowing damages for improvements not in existence" and that where such a map is admitted in evidence testimony placing a price per lot should be excluded. *Id.* at 398, 139 S.E. 2d at 556.

Because "[e]xceptional circumstances will modify the most carefully guarded rule," 4 Nichols § 12.314, we make no attempt here to define the "proper circumstances" which will render a map of a proposed subdivision of undeveloped land admissible to explain the testimony of a witness. The opinion in *Conrad* suggests that when the highest and best use of the property is in dispute a subdivision map made by an expert engineer from an actual survey would be competent to illustrate his testimony that a subdivision was possible and practical. *See Campbell v. City of New Haven*, 101 Conn. 173, 125 A. 650 (1924), where the court in admitting such a map carefully limited it to that purpose and instructed the jury that it was not evidence of the use which the owner intended to make of the property at some future time. Certainly the admission of a map showing a subdivision which was not an accomplished fact would be an invitation to the jury to value improvements not in existence. In the absence of most positive instructions that the jury could not value the land on a per-lot basis, and an explanation of the reasons why it would be improper to do so, prejudice may be assumed.

[3] On their facts, *Barnes* and *Conrad* cannot be regarded as authorizing the admission of either Exhibit B or C in evidence in this case. We hold that the admission of these maps constituted prejudicial error.

Although the highest and best use for other portions of the 268.5 acres taken was in dispute, all the evidence tended to show that the 28.5 acres comprising Section One were adaptable to practical resort residential development. Exhibit B, therefore, was not offered to counter any contention by the State that a

subdivision of Section One was either impossible or impractical. By survey and computation an expert civil engineer had determined that the plan could become an accomplished fact and, to that end, the streets shown on Exhibit B had been rough graded and could be seen on the ground—nothing else. The development of Section One was far from being an accomplished fact. The Board of County Commissioners had not approved the plat of the proposed subdivision, and it had not been recorded. The plan could, therefore, have been changed at the will of the owners. To have sold a lot with reference to the plat would have been a misdemeanor. G.S. 153-266.6 (1964). The rough-graded streets had been neither dedicated nor accepted. Even assuming eventual approval by the county commissioners of the planned subdivision, extensive and expensive work remained to be done before the realtor who was to handle the sale of the lots could go into action. The cost of developing the land into salable lots and then advertising and selling them, the amount of taxes, interest and maintenance to be paid until all the lots should be sold—all of these items were clearly speculative and not susceptible of proof.

With reference to Exhibit B the judge told the jury only that the map was not substantive evidence and that its sole purpose was to illustrate the testimony of the witness Killingsworth. We apprehend that, as a practical matter, all the jury understood about Exhibit B from this instruction was that it showed 28.5 acres of the 268.5 taken to have been divided into 79 lots.

Thereafter Exhibit C was admitted in evidence. This map of the entire property taken showed not only respondents' immediate plans for 28.5 acres but their aspirations for much of the remaining acreage. It depicted the 79 lots of Section One laid out on the east side of the base of the Y, leaving approximately four-fifths of the entire ocean frontage apparently available for subdivision. By hatched lines it designated 20 lots which had been "sold" to DeLoach and Del-Cook. In addition, by dotted lines, it purported to show Section Two as 106 lots adjoining Section One on the west and extending south about halfway along the western stem of the Y. Section Two, which existed only in the minds of the planners, was indeed an imaginary subdivision on raw land in its original undeveloped state. Further, Exhibit C designated the entire north end of the base of the Y, which extended about 900 feet along the government

taking line and over 600 feet along the ocean front, as a "Hotel-Motel Site" and "Proposed Development Office Site." The south by the State's failure on *voir dire* to offer its evidence on this Facility, Docks, Repairs, Fuel, Restaurant, etc." See Illustrative Maps Nos. 2 and 3.

At the time Exhibit C was received in evidence and placed on the wall, the jury was instructed to consider it for no purpose whatever except to illustrate the testimony of the witness Moorman and to disregard "any references thereon or any designation or information disclosed therein except that which illustrates the testimony of this witness." This instruction asked too much of the jury. The probability that this map, which showed nonexistent subdivisions, would mislead the jury into valuing nonexistent improvements created a risk which outweighed its value for illustrative purposes. We note that the judge at no time told the jury that in determining the market value of the land taken they could not consider the number of lots shown on the map or value the undeveloped property on a per-lot basis. Exhibit C remained on the wall and was also used to illustrate the testimony of two other witnesses.

Moorman used Exhibit C to point out to the jury the 20 lots of Section One which respondents had conditionally sold to DeLoach and Del-Cook for $160,000. Testimony by Killingsworth, admitted over the State's objection, tended to show lots in Section One had been sold for $8,000 each and that, on a per-lot basis, Section One had a value of $632,000. This evidence refutes respondents' contention that "no value on a per lot basis was stated or suggested by any witness." Whether the jury applied this evidence of value to the 106 lots shown in proposed Section Two we cannot know. The admission of the maps and the evidence of these two conditional sales, however, set the stage for the jury to value undeveloped land on a per-lot basis without reference to the cost of development.

[4] Assuming the good faith of the transactions between respondents and DeLoach and Del-Cook, at most they were but conditional sales, dependent upon future accomplishments which the condemnation proceeding made impossible. Since payment of the purchase price was conditioned upon the completion of the subdivision—at what cost per lot no one could then say—the transactions in nowise disclosed what DeLoach or Del-Cook would have been willing to pay for the property as it was on

6 June 1968, the date of the "sales." The escrow arrangement, however, conclusively proved the unwillingness of each to pay $80,000.00 for 10 lots which then existed only on the map of a subdivision, the development of which had just been started. The admission of this evidence contravened decisions of this Court and constituted prejudicial error.

[5] Similarly prejudicial was the evidence that lots, fronting 200 feet on the ocean and extending back 100 feet *in the developed portion* of Shell Island, were selling for $75.00 per front foot or $15,000.00 a lot. Respondents elicited this testimony during the cross-examination of the State's expert witness Cantwell, who had testified on direct examination to his opinion of the fair market value of the land taken. It was competent for respondents to question Cantwell's knowledge of the value of coastal lands in that area and, in response to such questions, he had said that he himself had appraised Shell Island and knew at what price lots thereon had been sold and the price at which the remaining lots were listed for sale. This information satisfied the only legitimate purpose the question could have had. The record does not disclose whether Shell Island, before it was developed, was land comparable to the land in suit, the extent of its present development, or any other facts which would make values on Shell Island evidence of the value of the subject property. Respondents' purpose in eliciting the figures $75.00 and $15,000.00 before the jury could only have been "to induce thereby a liberal award. This within itself would violate the applicable rule of evidence, since such evidence under the circumstances cannot be considered on the question of value." *Barnes v. Highway Commission, supra* at 396, 109 S.E. 2d at 233.

Question (4) involves the admissibility of the purchase price of the three adjacent small tracts which the State obtained from Morton and Orrell. The State argues (1) the disparity in size between each of the three lots and the subject property made the tracts dissimilar as a matter of law; (2) all the evidence tends to show dissimilarities which negate the court's findings that the tracts were in fact "sufficiently comparable" to render the purchase prices properly admissible in evidence; and (3) evidence of the price for which a condemnor purchased other land required for a project is not admissible as evidence of the value of land being condemned for it.

When it was first offered, and on a number of occasions thereafter, the State forcefully objected to any evidence of the purchase price of these three tracts. However, on at least one occasion, this evidence went in without objection. Ordinarily such a failure to object would waive the previous objections. *Price v. Whisnant*, 232 N.C. 653, 62 S.E. 2d 56 (1950). However, in view of the highly prejudicial nature of that evidence, we consider this assignment of error. The questions it poses are certain to recur upon the retrial of this case.

[6]   It is the rule in this State that the price paid at voluntary sales of land, similar in nature, location, and condition to the condemnee's land, is admissible as independent evidence of the value of the land taken if the prior sale was not too remote in time. Whether two properties are sufficiently similar to admit evidence of the purchase price of one as a guide to the value of the other is a question to be determined by the trial judge in the exercise of a sound discretion guided by law. *Redevelopment Comm. v. Panel Co.*, 273 N.C. 368, 159 S.E. 2d 861 (1968) ; *Highway Commission v. Conrad, supra.*

It would seem that because of the difference in size between the 268.5 acres condemned and the three tracts purchased, and because of other differences, the trial judge should have ruled that the three tracts were not comparable properties. As one of respondents' expert witnesses pointed out, the largest of the three tracts "is not even five percent of the total of the subject property."

As pointed out in 5 Nichols § 21.31[3] (1969) : "It is not necessarily objectionable that the lot of land, the price of which it is sought to put in evidence, is of different size and shape from the lot taken; nevertheless, the court may properly exclude evidence of the price paid for similar land in close proximity to the land taken if the lot sold is much smaller than the land in controversy. A large piece of land cannot usually be applied profitably to the same uses as a small piece, and if the large piece is to be cut up into lots of the same size as the small piece, the length of time necessary to dispose of the lots to different purchasers is so uncertain that the price at which one such lot would sell multiplied by the number of lots is no criterion of the present value of the entire parcel." *See also* Annot., 85 A.L.R. 2d 110, 143-149 (1962).

It is quite probable that the judge's findings with reference to the three tracts in question was materially influenced by the State's failure on *voir dire* to offer its evidence on this point. However, because of the view we take with reference to State's contention (3) above, it is not necessary for us to decide whether the judge's finding of similarity exceeded sound judicial discretion or was error as a matter of law.

The majority rule is "that evidence as to the price paid by the same or another condemning agency for other real property which, although subject to condemnation, was sold by the owner without the intervention of eminent domain proceedings, is rendered inadmissible to prove the value of the real property involved merely becauses the property was sold to a prospective condemnor." Annot., 85 A.L.R. 2d 110, 163 (1962). *Accord,* 5 Nichols § 21.33 (1969); 27 Am. Jur. 2d *Eminent Domain* § 430 (1966). The rationale is that a sale to a prospective condemnor is in effect a forced sale; that at best it represents a compromise and consequently furnishes no true indication of the price at which the property could be sold in the open market to a "willing buyer"; that the condemnor may pay more in order to avoid the expense and uncertainty of the condemnation proceeding, while the seller may accept less in order to avoid the same or similar burdens. 1 Orgel, *Valuation* under the *Law of Eminent Domain* § 147 (2d. ed. 1953). This reasoning also applies to amounts paid by a condemnor for neighboring land taken for the same project—however similar the lands may be—whether the payment was made as the result of a voluntary settlement, an award, or the verdict of a jury. 5 Nichols § 21.33 (1969). *See also* 29A C.J.S. *Eminent Domain* § 273(7) (1965).

In some jurisdictions it is held that evidence of a sale otherwise competent is not necessarily inadmissible because the purchaser had the power of eminent domain. However, the burden is upon the party who offers such evidence to establish as a preliminary fact not only that the respective properties are comparable but also that the purchase was not so influenced by compromise or compulsion as to influence the price and therefore to destroy its usefulness as a standard of value. *See* authorities collected in *Hannan v. United States,* 131 F. 2d 441, 442 (D.C. Cir. 1942). *See also Stewart v. Commonwealth,* 337 S.W. 2d 880 (Ky. App. 1960); *State v. McDonald,* 88 Ariz. 1, 352 P. 2d 343 (1960); *Amory v. Commonwealth,* 321 Mass.

240, 72 N.E. 2d 549, 174 A.L.R. 370 (1947) ; I Wigmore, Evidence § 18 (E) (3d ed. 1940). In *Transwestern Pipeline Co. v. O'Brien,* 418 F. 2d 15 (5th Cir. 1969), it is said that the burden of establishing the admissibility of evidence as to the price paid by a condemnor for other similar property "is a heavy one." *Id.* at 19.

This Court held in *Light Co. v. Sloan,* 227 N.C. 151, 41 S.E. 2d 361 (1947), that the amount which the condemnor paid the respondent under a consent judgment for land taken in condemnation proceedings was incompetent to establish the value of additional land subsequently taken from the respondent. This rule was approved in *Barnes v. Highway Commission, supra. See also Highway Commission v. Pearce,* 261 N.C. 760, 136 S.E. 2d 71 (1964). In *Carver v. Lykes,* 262 N.C. 345, 356, 137 S.E. 2d 139, 148 (1964), we quoted with approval the following excerpt from II Wigmore, *Evidence* § 463 (3d ed. Supp. 1962) : "[E]vidence of amounts paid by the condemnor for property similarly situated, in the absence of extraordinary circumstances, is inadmissible, because such sales are involuntary and therefore, under the substantive law, run counter to the essential ingredient of fair market value."

[7]  It is our opinion that any sale to a prospective condemnor is highly unlikely to be a fair test of market value, and that a preliminary determination by the trial judge that the sale was not tainted by compulsion or compromise cannot establish it as a reliable standard. As the Court of Appeals of Kentucky said in *Stewart v. Commonwealth, supra,* "We think that such an inquiry into matters of motivation ventures too far into the realm of speculation and is not a satisfactory substitute for the rule of no admissibility. We therefore adhere to the latter rule." *Id.* at 882. For the same reason we hold that the admission of the prices paid for the three tracts, which tended to show an approximate per-acre valuation of from $5,000.00 to $9,700.00 for land adjacent to the 268.5 acres taken, constituted prejudicial error.

[8]  Question (5) is whether respondent Killingsworth's testimony that "at a future date" respondents "proposed" to construct a marina, a motel, and condominiums on the 268.5 acres condemned was incompetent and prejudicial. The answer is Yes.

It was entirely proper for respondents to offer evidence tending to show the highest and best use to which different

areas of the 268.5 acres taken were adopted, whatever that use might have been. However, "[I]t is not ordinarily competent for the owner to show what use he intended to put the property, nor what plans he had for its improvement, nor the probable future use of the property, nor the profits which would arise if the property were devoted to a particular use." 27 Am. Jur. 2d *Eminent Domain* § 435 (1966).

In *Land Co. v. Traction Co.*, 162 N.C. 503, 78 S.E. 299 (1913), the sole issue was the market value of land which defendants had condemned. The trial judge admitted evidence that the owner intended to convert a part of the condemned property into a park and beautify it "by laying off walks and building summer houses and otherwise." Upon appeal the Court awarded the defendants a new trial because the judge "erred in admitting evidence as to the speculative uses to which the owner intended to put the property and as to its contemplated improvement. . . . " *Id.* at 505, 78 S.E. at 299. Chief Justice Clark pointed out that, although it was proper to show the condition of the property, its surroundings and all the uses to which the land was adapted, it was not competent to prove by the owner the uses to which he had intended to devote it. *Accord, Light Co. v. Clark*, 243 N.C. 577, 91 S.E. 2d 569 (1956).

In condemnation proceedings the determinative question is: In its condition on the day of the taking, what was the value of the land for the highest and best use to which it would be put by owners possessed of prudence, wisdom, and adequate means? "The owner's actual plans or hopes for the future are completely irrelevant." Such aspirations being "regarded as too remote and speculative to merit consideration." 4 Nichols § 12.314 (1971).

[9] Here it was competent for the owners to show that, on the day of the taking, streets had been rough graded and surveyor's control stakes placed on the 28.5 acres as initial steps in laying out a subdivision on that portion of the condemned property. This evidence bore directly upon the value of the land on the day of the taking. (1) The actual laying out of streets tended to show that this section was adapted to use as a residential subdivision, and (2) the grading which had been done was a part of the overall condition of the land on the day it was taken and one of the factors to be considered

State v. Johnson

in determining the value which Section One had at that time for development as a residential subdivision. However, the value of the property was not augmented because the condemnation proceeding prevented respondents from carrying out their plans to develop a subdivision. "[T]he value of the property may not be enhanced by reason of the frustration of the owner's plans with respect to his property. . . . " 4 Nichols § 12.3142[3] (1971).

Of course, the actual laying out of streets also evidences the owner's intended use of the property, but such evidence is not prejudicial when its purpose and effect is simply to show or illustrate the adaptability of a condemnee's land for the proposed use. However, evidence as to intended use "becomes improper and prejudicial if and when its purpose and effect is 'to show enhanced loss because the owner is prohibited from carrying out that particular improvement,' . . . or 'if the object is to enhance the damage by showing such a [proposed] structure would be a profitable investment.'" *Empire Dist. Electric Co. v. Johnston,* 241 Mo. App. 759, 766, 268 S.W. 2d 78, 82 (1954). Obviously, appropriate instructions are required to avoid confusion in the minds of the jurors when an owner's plans for his property have been demonstrably thwarted by a condemnation proceeding.

Question (6) is a challenge to the following portions of the charge:

"The payment of just compensation does not depend on whether the owners are of good character or otherwise. That is not the criterion. In this case, the owners, from outward appearance and insofar as we know, are fine high quality citizens, good people, and they are entitled to just compensation. No more and no less. If there was any reason to suspect or know that they were less than good people, your duty would remain the same. They would be entitled to just compensation. No less and no more. Because it is a cardinal principle upon which our government is founded, that all citizens are entitled to just treatment whether they be high, low, rich or poor, humble or proud, and regardless of race, color or creed. If there are times and occasions when our State or any governmental agency or local part thereof does not attain that ideal it is because of human weaknesses and limitations and it behooves all citizens

and governmental agencies to strive constantly to overcome those shortcomings."

[10, 11] The character of an owner is clearly irrelevant to his right to receive just compensation when his land is taken by the State. Evidence of the good or bad character of a party to a civil action is generally inadmissible. Such evidence, *inter alia,* offers "a temptation to the jury to reward a good life or punish a bad man instead of deciding the issues before them." Stansbury, *N.C. Evidence* § 103 (2d ed. 1963). Until the credibility of a party who has testified in his own behalf has been impeached by imputations of bias, inconsistencies in his statements, or otherwise, his good character may not be proved to corroborate his testimony. *Id.* § 50.

[12, 13] In this case only one of the owners, respondent Killingsworth, testified. Neither the State nor respondents offered any evidence bearing upon his general character. The State contends that, in telling the jury the owners appeared to be "fine high quality citizens, good people and they are entitled to just compensation," in effect, the judge made himself a character witness for the owners and thereby bolstered the credibility of Killingsworth's estimate as to the value of the land and other disputed portions of his testimony. The State further contends that the court's admonition that it behooves all citizens and governmental agencies to strive constantly to overcome any shortcomings on the part of the State carried the implication that the State had not dealt fairly with respondents, as well as the suggestion that the jury should right the wrong.

The State's contentions have merit. The quoted charge was uncalled for in this case, and we apprehend that the jurors may have misinterpreted it to the State's prejudice. Such a result, of course, the judge did not intend. However, it is error for the court to charge upon an abstract principle of law or duties not applicable to the evidence in the case. *White v. Cothran,* 260 N.C. 510, 133 S.E. 2d 132 (1963); *Electric Co. v. Dennis,* 259 N.C. 354, 130 S.E. 2d 547 (1963).

[14] The State's final assignment of error for discussion is that the court erred in taxing against the State expert witness fees totaling $1,600.00 for four of respondents' witnesses: Walter Moorman, whom the court found to be an expert engineer in the field of land development, planning, and drainage— $300.00; J. K. Taylor, Jr., Richard Kepley, and D. M. Stout,

each of whom the court found to be an expert appraiser of real property—$300.00, $400.00, and $600.00 respectively. The State's contention is that none of these witnesses were under subpoena and the court was, therefore, without authority to allow them expert witness fees. Respondents contend that, in contrast to other witnesses, there is no requirement that an expert witness must be under subpoena to collect a witness fee.

The court's power to tax costs is entirely dependent upon statutory authorization. *City of Charlotte v. McNeely,* 281 N.C. 684, 190 S.E. 2d 179 (1972). In support of respective positions the parties rely upon G.S. 7A-314 (Supp. 1971) which, in pertinent part, provides:

"(a) A witness under subpoena, bound over, or recognized, other than a salaried State, county, or municipal law-enforcement officer, or an out-of-state witness in a criminal case, whether to testify before the court, jury of view, magistrate, clerk, referee, commissioner, appraiser, or arbitrator shall be entitled to receive five dollars ($5.00) per day, or fraction thereof, during his attendance, which must be certified to the clerk of superior court.

                    *     *     *

(d) An expert witness, other than a salaried State, county, or municipal law-enforcement officer, shall receive such compensation and allowances as the court, in its discretion, may authorize. A law-enforcement officer who appears as an expert witness shall receive reimbursement for travel expenses only, as provided in subsection (b) of this section.

(e) If more than two witnesses are subpoenaed, bound over, or recognized, to prove a single material fact, the expense of the additional witnesses shall be borne by the party issuing or requesting the subpoena."

Respondents' position is that Section (a) above has no application to Section (d). As we interpret G.S. 7A-314, however, Sections (a) and (d) must be considered together. Section (a) makes a witness fee for any witness, except those specifically exempted therein, dependent upon his having been subpoenaed to testify in the case, and it fixes his fee at $5.00 per day. As to expert witnesses, Section (d) modifies Section (a) by permitting the court, in its discretion, to increase their

compensation and allowances. The modification relates only to the amount of an expert witness's fee; it does not abrogate the requirement that all witnesses must be subpoenaed before they are entitled to compensation.

Since the witnesses Moorman, Taylor, Kepley, and Stout did not testify in obedience to a subpoena, we hold that the court was without authority to allow them expert fees or to tax the State with the costs of their attendance. "A witness who attends court without having been summoned is not entitled to prove his attendance or to charge the losing party with the amount of his tickets." *State v. Means*, 175 N.C. 820, 822, 95 S.E. 912, 913 (1918). *See also* G.S. 6-53 (Supp. 1971). This holding renders Section (e) immaterial to decision here. However, we note that the testimony of witnesses Taylor, Kepley, and Stout tended to prove a single material fact, the fair market value of the land being taken. Thus, had these three witnesses been subpoenaed, under Section (e) the fees of only two could have been taxed against the State.

We deem it unnecessary to discuss the State's remaining assignments of error since they raise questions not likely to recur at the next trial. For the errors pointed out in the opinion the judgment of the Superior Court is vacated, and this cause is remanded for a retrial.

New trial.

Justice MOORE took no part in the consideration or decision of this case.

Justice HIGGINS concurs in result.