STATE of Minnesota, By Warren SPAN-NAUS, its Attorney General, petitioner, Appellant (50634) Respondent (50693),

v.

Delmar DANGERS and Alyce Marie Dangers, his wife, Respondents (50634) Appellants (50693).

Nos. 50634, 50693.

Supreme Court of Minnesota.

Dec. 4, 1981.

Warren Spannaus, Atty. Gen., Richard B. Allyn, Sol. Gen., Gilbert S. Buffington and Louis K. Robards, Sp. Asst. Attys. Gen., St. Paul, for appellant in No. 50634 and for respondents in No. 50693.

Estebo, Carey, Schnobrich & Frank and John W. Carey, Fairfax, for appellants in No. 50693 and for respondents in No. 50634.

OTIS, Justice.

This is an eminent domain proceeding in which the State of Minnesota, by its Department of Natural Resources, acting for the State Historical Society, is acquiring respondents' 148.1 acre improved farm located in Nicollet County as an addition to Fort Ridgely State Park.

In September of 1976, respondents entered into an agreement with the state by which they agreed to permit the state to condemn their property. *See* Minn.Stat. § 84.027, subd. 9 (1980). Thereafter, in November of 1976, the Nicollet County District Court granted the state's petition to acquire respondents' property and appointed three commissioners to assess damages. In December of the same year, the commissioners filed an award of $198,970. Both parties appealed. After trial of the appeal on the issue of just compensation in district court in October of 1978, the jury returned a verdict of $496,000. Judgment was entered pursuant to that award. The state appeals and respondents cross-appeal, asserting that the trial court erred in its rulings disallowing attorneys fees, disallowing certain other costs, and excluding evidence of the going concern value and lost profits of respondents' mink ranching business. We reverse and remand.

The issues in this appeal are relatively narrow. However, their impact on the state's long-range plans for preserving important historic sites has considerable significance with respect to future acquisitions. Accordingly, we find it inappropriate to condone, in the interest of expedition, fundamental errors of law which have resulted in a highly distorted verdict.[1]

Three basic factors bearing on the value of this property are undisputed. First, although Mr. and Mrs. Dangers paid only $29,000 for these 148.1 acres in 1960, they have made substantial improvements on it using it for gravel mining and mink ranching. Second, the value of southern Minnesota farm land generally had, in recent years, increased greatly by December 1976, the date of taking. Third, the land on which Fort Ridgely was built in 1851, and its immediately adjacent area, are of unique historic interest to the people of Minnesota.

What was not proved by any probative evidence beyond the unsupported conclusions of respondents' experts, was what his-

---

1. Although it is regrettable that the condemnation action and these judicial proceedings have been unduly protracted, it should be noted that the owner's total investment was about $149,000, and in March 1977 he received a partial payment from the state of $149,227.50.

toric value the property had for any purchaser except the state and its agencies. Nevertheless, those witnesses were permitted to submit to the jury opinions which in one instance increased the value from $179,000 as farm land used as a mink ranch and for gravel mining, to the sum of $739,000 as an historic site. Another witness for respondent testified the property was worth $320,000 for the purposes to which it was being devoted, but was worth $800,000 as an historic site.[2]

Both witnesses stated its highest and best use was as an historic site, but neither attempted to substantiate the claim that a market existed in the private sector for such property.[3]

The likelihood of there being no ready market for historic sites is underscored by the fact that to preserve their historic character almost all commercial activity would have to be severely circumscribed. Indeed most such sites cannot be tampered with under state and federal laws without explicit permission of a state agency. Minn. Stat. § 138.60, subd. 2 (1980); 42 U.S.C. § 1500c–1 (1976). *See also*, Minn.Stat. § 471.193 (1980).

Here no facts were presented to demonstrate in what manner the property's historic value could be exploited so as to produce an economic return. It would be a rare individual with a zealous and philanthropic commitment to history who could afford to pay a premium of $560,000 or $480,000 over and above comparable property to preserve for posterity 148.1 acres of what would otherwise be ordinary farm land operated as a gravel pit and mink ranch. This is uniquely a public responsibility and the evidentiary rules governing the cost of such acquisitions are designed to prevent the jury from being distracted by what the government gains, rather than by focusing on what the landowner has lost.

Although the verdict of $496,000 was less than the highest values assigned to the property by the owners' experts, it was obviously inflated by what was clearly improper testimony. As we have indicated, in one instance a witness added $460,000 for historic value, and in another a witness added $480,000. What makes such values perverse was correctly stressed by the trial court in his charge. In an effort to prevent the very result which occurred, the court gave these instructions:

> I think it's a fair statement to make and I believe it's conceded by the parties here, that if you regard the highest and best use of this property as historical, that use is inconsistent with its use as a farm, or more particularly with its use as a gravel pit. I think you may fairly conclude that you could not get historical value or that you would destroy large measure of historical value if you excavated off the overburden to remove anywhere from 5 to 15 feet of gravel or whatever. So, I mention that inconsistency because you could not properly in valuing this property say, "Well, it's worth so much on account of the gravel in it, but it's also got historical significance," and in some way compound those values. You have got to go one way or the other and if in your mind it's worth more as a gravel pit than it's worth historically, then the gravel pit value controls and you simply forget about the historic. * * * I don't think it would be necessarily inconsistent to use part of the property as a farm or home site and to preserve the rest for historical value.

By the size of the verdict it seems undisputed that the jury erroneously added the value the property had for sand and gravel mining to a value it assigned as an historic site. Yet it is difficult to understand what appeal the property would have for historic purposes in the midst of mining and mink farm operations.

---

2. This opinion was somewhat imprecisely stated: "We estimated that a buyer would be justified in paying two and a half times the general value to anybody for the value for historic purposes."

3. Some of the difficulties in stimulating public interest for investing private funds in historic sites are illustrated by the abortive efforts to preserve the so-called Red Wing Irish Row Houses. *See* State by *Powderly v. Erickson*, 301 N.W.2d 324 (Minn.1981).

Without speculating on exactly what evidence influenced the jury's verdict, we do not agree that the error in receiving improper expert testimony was not so prejudicial as to justify a new trial. We are persuaded that virtually all of respondent's case for historic value hinged on evidence which was inadmissible under well-settled rules and resulted in a verdict which could not be supported had the evidence been excluded.

Testimony which should have been excluded came from two witnesses. Professor Karl Egge, a Macalester economist, determined by historical research that in 1895 the State of Minnesota paid $80 an acre for 20 acres on which Fort Ridgely was located. He then determined that eleven other comparable properties in that area were sold in the 1890's for an average of $19.36 per acre. Applying the ratio of $80 to $19.36, or 4.13 to 1, to the present values of farmland in the Fort Ridgely area which was $1,209 per acre, he arrived at the figure of $4,993 per acre for the property here under consideration. Multiplying $4,993 by 148.1 acres he came up with a present value of $739,000.

Although another witness for respondent, Howard Shenehon disregarded the fact that in 1960 respondent paid only $29,000 for the property, because the witness didn't feel that a 19-year-old sale had "much bearing on the December 1976 market value," he too relied on the ratio between what the state paid in 1895 and other comparable sales at that time.

That such testimony was not only inadmissible but was highly prejudicial is borne out by decisions of this court and those of other jurisdictions, to which we refer below.

Chapter 375 of the Minn. Session Laws of 1895 contains an illuminating account of the role Fort Ridgely played in the state's history, as well as details of the transaction by which the site was acquired:

### CHAPTER 375.

An Act for an appropriation for the erection of a suitable monument to mark the site of Fort Ridgely and to commemorate the siege of the same by the Sioux Indians in the year one thousand eight hundred and sixty-two.

Whereas, about the year one thousand eight hundred and fifty-one Fort Ridgely was erected by the United States government on the upper waters of the Minnesota river, in the then territory of Minnesota.

Said fort when erected was an extreme frontier post, and was in the heart of the country occupied by the Indians.

It was designed as a protection to the inhabitants of Minnesota from such Indians, as the said territory was then being rapidly settled by the whites and had promise of a large future growth.

In August one thousand eight hundred and sixty-two part of one company of the Fifth Regiment of Minnesota volunteer troops, which had been mustered into the United States service for the suppression of the rebellion, was stationed there.

When the great Sioux outbreak occurred at the Sioux agencies, a short distance up the Minnesota river from the fort, and Capt. John F. Marsh, who was in command at the post, was, on August eighteenth, one thousand eight hundred and sixty-two, killed with twenty-four of his men on a march to relieve the agencies.

On the twentieth of August, one thousand eight hundred and sixty-two, the fort was attacked by a large body of Indians, who were repulsed with one hundred and one men of companies "B" and "C" of the Fifth Minnesota regiment and eighty citizens, under the command of Capt. T. J. Sheehan, who continued in command of said fort during the trying occurrence following.

On the twenty-first of August, one thousand eight hundred and sixty-two, two further attacks were made on the fort, one in the morning, and the other in the afternoon, in both of which the Indians were repulsed.

On the twenty-second of August a desperate assault was made on the fort by the combined forces of the Indians, which lasted for five hours and, as related by an

official historian of the war, "was bitterly fought and courageously and intelligently resisted," and resulted in the defeat of the savages.

The stubborn resistance offered by Fort Ridgely was largely instrumental in saving the state of Minnesota from devastation and destruction by the Sioux.

After the war was over the fort was totally abandoned and fell into private ownership.

All its buildings were either burned or dismantled by surrounding settlers and not a vestige of it remains.

The site of the old fort is historical, and the recollections of the events which transpired there are endeared to our state, and it is the great desire of the people of the state of Minnesota that the memory of the important part it played in the early settlement of the state should be perpetuated to future generations, which can best be done by the purchase of a piece of land embracing the actual locality where the buildings once stood, together with the parade grounds, which would not require more than ten acres.

This can be obtained from the present owner.

On this land should be erected an appropriate monument with suitable inscriptions similar to those which have been erected on the Custer and other battle fields by the United States government. Therefore,

Be it enacted by the Legislature of the state of Minnesota:

Section 1. That the sum of three thousand dollars, or so much thereof as may be necessary, is hereby appropriated from any funds in the state treasury not otherwise appropriated, for the purpose of purchasing not to exceed ten acres of land, which land shall embrace the site of the buildings which constituted Fort Ridgely, in the county of Nicollet, together with the parade ground of said fort and for the erection thereon at some appropriate point within said parade ground, as near the site of the flagstaff of said fort as possible, a suitable monument of stone and bronze, with appropriate inscriptions thereon, to commemorate the attacks on said fort by the Sioux Indians in the year one thousand eight hundred and sixty-two, and to protect said monument when erected.

SEC.2 The governor of this state is hereby directed to appoint a commission of seven persons, two of whom shall reside in the city of St. Paul, two in Nicollet county, one in Winona, one in Renville county and one in Redwood county, who shall have full power to purchase said land in the name of the state of Minnesota and to design and erect said monument thereon, and to place thereon such inscriptions as in their judgment will carry out the spirit and intent of this act.

SEC.3. That the treasurer of this state shall pay any moneys not exceeding the sum of three thousand dollars for the purposes aforesaid, on the warrant or order of said commission or a majority of it.

SEC.4. This act shall take effect and be in force from and after its passage. Act of April 25, 1895, c. 375, 1895 Minn. Laws 774–76.

A number of unusual circumstances militate against this being an ordinary arm's length purchase by the state. Significantly the commission seems to have received a lump sum appropriation with which to buy the land and build the monument. Apparently the commission was under no particular restriction as to the amount to be spent on either, if the total did not exceed $3,000. Whether they paid too much for one and not enough for the other was perhaps of no great concern. Whatever may have been the allocation, it is clear that the price paid could not be used as evidence in subsequent litigation.

The general rule was approved by our 8th Circuit Court of Appeals in *Evans v. United States*, 326 F.2d 827 (8th Cir. 1964), where the court held that the price paid by a condemnor for similar land cannot be introduced in subsequent litigation because it is a compromise to avoid the expense and uncertainty of litigation. *See also Regents of the University of Minnesota v. Hibbing,*

302 Minn. 481, 225 N.W.2d 810 (1975). *Accord State v. Johnson*, 282 N.C. 1, 191 S.E.2d 641 (1972).

Although counsel for the respondent made only one reference in his closing argument to the State Historical Society's "paying a premium price for historically significant property", any suggestion that the necessities of the condemnor are an element of damages is inadmissible. This passing remark in context was not improper and the trial court's charge was balanced and comprehensive. In cases of this kind, however, the court would be well advised to give a cautionary instruction to the jury which makes clear that damages are to be measured by what is taken from the owner and not by the necessities of the condemnor or the peculiar advantages which accrue to the condemnor by the taking. *United States v. Cors*, 337 U.S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392 (1949); *United States v. 13,-255.53 Acres of Land*, 158 F.2d 874 (3rd Cir. 1946); *Minneapolis-St. Paul Sanitary District v. Fitzpatrick*, 201 Minn. 442, 277 N.W. 394 (1937); *Union Depot, Street Railway & Transfer Co. of Stillwater v. Brunswick*, 31 Minn. 297, 17 N.W. 626 (1883); *State of New Jersey v. Wemrock Orchards, Inc.*, 95 N.J.Super. 25, 229 A.2d 804 (1967).

Since there is to be a new trial we need not address the issues raised on the cross-appeal beyond noting that we find no error in the rulings complained of.

We remand and direct the trial court to fashion an appropriate remittitur and in the event such a remittitur is rejected by the parties, grant a new trial.

YETKA, Justice (concurring in part and dissenting in part).

I concur in the result and agree that it was error to allow the experts for the landowners to use a ratio based on the amount the state originally paid for the land. I do not agree, however, that a landowner should be barred from offering evidence that historically significant property is worth more than similar property. For example, suppose one owns property which was once the family home of a United States President. If the state or federal government seeks to acquire that property, the owner ought to be able to introduce the record title to the property into evidence in the condemnation proceeding. Such property, as a result, would have a greater market value. A jury ought to be able to add some value for the property's historical significance to the ordinary market value. Experts should be able to testify as to the value of the property's historical significance. To the extent the majority opinion would bar such evidence, I dissent.