PRICE and others, Appellants, v. Ross, d/b/a Arthur Murray School of Dancing, Respondents.

*No. 200. Argued January 2, 1974.—Decided February 25, 1974.*
(Also reported in 214 N. W. 2d 770.)

336

338

340

For the appellants there were briefs by *Laurence C. Hammond, Jr., William A. Stearns* and *Quarles, Herriott, Clemons, Teschner & Noelke,* all of Milwaukee, and oral argument by *Mr. Stearns.*

For the respondent there was a brief by *Levin, Blumenthal, Herz & Levin* of Milwaukee, and oral argument by *William Jon Marquardt* of Milwaukee.

HEFFERNAN, J. The plaintiffs make no claim for weekly payment arrearages prior to April 1, 1965. It was at that time or shortly thereafter that the weekly payments were reduced from $250 to $150 per week. It was agreed that, from that date until August 31, 1967, the date the trial judge concluded that the cancellation of the franchise by Arthur Murray terminated all obligations, Ross had paid $16,900. It was agreed that, if August 31, 1967, were the proper termination date and if the court found that only $150 per week was due, the amount owed the plaintiffs was $2,000. It was also agreed, however, that, if Ross were required to pay $250 a week after March 23, 1967, the date on which the attorney for Price and Brodie made the demand for the larger sum, then the difference due and owing the plaintiffs was $4,300 plus interest.

We conclude that the reduction to $150 per week granted by Evons was merely a temporary accommodation to Ross and was rescinded by the Price-Brodie letter of March 23, 1967.

The evidence supports the plaintiffs' contention that the reduction in payments was a temporary measure only, and Ross concedes as much in his brief, although he argues that the temporary reduction could not be rescinded by Price and Brodie alone.

The exhibits reveal that, as a memorandum recapitulation of a telephone conversation between Evons and Ross, Evons wrote to Ross on June 2, 1965, stating, "I agreed to temporarily accept $150 per week or 5% of the gross." Ross responded to that letter on June 8, 1965, asking for clarification of the quarterly computation of 5 percent of the gross, but did not dispute or refer to the statement in Evons' letter that the reduction was "temporary."

Ross claims that, when he consented to the assignment to Brodie and Price, the assignment was conditioned on the permanent reduction of the weekly payments. That

consent to assignment contains no conditions, and the argument that the assignment was conditioned is not supported by the record.

Ross in his brief argues that at trial he testified that it was his understanding that he would only be obligated to pay $150 a week after the date of the assignment to Brodie and Price. That statement was objected to, and the judge ruled, "The instrument itself would be the best evidence." Accordingly, with the exception of the statement by Ross, which was in effect stricken from the record, there is no evidence supporting the contention that Ross' consent to the assignment was in consideration of, or conditioned on, continued reduced payments.

Ross argues, in any event, that the finding of the trial court should be upheld because Price and Brodie consented to the $150 weekly payments by continuing to accept them and by not taking any action subsequent to their demand letters. The record reveals to the contrary. The letter of April 13, 1967, by the attorney for Price and Brodie, renewed the demand for $250 per week and stated that, unless payments were made in that sum, "they will have no alternative but to proceed with further action." Further action was taken when a demand was made on December 14, 1967, for the transfer of the franchise, and when suit was commenced early in 1968. Nothing in these transactions would have the effect of altering or waiving the assigned contract obligations.

As an additional defense, Ross argues that the assignment by Evons to Price and Brodie was a partial assignment; and, therefore, only Evons could reinstate the contract rate of $250 per week. The plain meaning of the assignment leads to a contrary conclusion. The entire contract and earlier agreement was assigned *in toto* to Price and Brodie, together with any payments that became due thereunder. The assignment of the entire contract was to remain fully effective until the $78,000 which Evons owed to Price and Brodie was paid in full.

This was not a partial assignment. It was an assignment of the entire contract, with the assignment to terminate at such time as the sum for which it was security was paid in full.

Accordingly, we conclude that the trial judge's finding should be reversed. Price and Brodie, as the assignees of the entire contract, had the authority to reinstate the $250 per week payment. The assignment was not conditioned on the continuation of the payments of $150 weekly.

In reversing the trial judge's finding, we do not need to reach the conclusion that it was contrary to the great weight and clear preponderance of the evidence. The question is one of law, the construction of a contract. *Moran v. Shern* (1973), 60 Wis. 2d 39, 46, 208 N. W. 2d 348.

Under the stipulation entered into by the parties, the plaintiffs should have received $4,300 for the arrearages incurred from April 1, 1965, to August 31, 1967. That stipulation, setting a cut-off time, however, was entered into in light of the possible finding of the trial judge that obligations ceased on August 31, 1967, when the existing franchise was terminated. That cut-off date has no significance, unless we conclude that Ross was relieved of all obligations on that date. Since we conclude, as will be discussed below, that the "termination" of the franchise did not relieve Ross, the arrearage at the rate of $250 per week continued to accumulate thereafter until the date of the alleged conversion.

As set forth in the statement of facts, Ross argues that, under the 1958 contract, all liabilities ceased when the franchise assigned to Ross was cancelled on August 31, 1967. We conclude, however, that the transaction which resulted in the termination of the original franchise and the issuance of a new franchise did not have that effect. The existing franchise was viable for another year. It was within Ross' control to have insisted upon

the continuation of that franchise and to have prevented any possible cancellation. The termination was not "beyond Ross' control." Moreover, the 1958 contract was intended to relieve Ross of his obligation only if he lost all right to operate the dance studio under the Arthur Murray franchise. That intent is indicated by paragraphs 11, 12, 13, and 14 of the 1958 contract, which provided that, in the event of termination, the franchise was to be assigned back to Evons through Niedland. Paragraph 13 of the contract would not be triggered if Ross continued to operate the dance studio as he did under a successor franchise agreement. Reading the contract as a whole, it provides that, if beyond the control of Ross he loses the right to operate an Arthur Murray franchise, he will be exonerated of the debt; but that situation contemplates the reversion of the franchise to Evons. Under the circumstances of the termination of the existing franchise and the entering into a new Arthur Murray franchise with Ross, this could not happen.

The obligation under the 1958 agreement continued unaffected by the issuance of the new franchise in 1967, and weekly payments in the sum of $250 should have been awarded the plaintiffs for the period between August 31, 1967, and the sale of the franchise by Ross to Frank O'Neill.

Since the trial judge found that Ross was exonerated from his obligation, he did not consider the question of the damages sustained by Price, Brodie, and Evons as the result of the conversion which occurred when Ross sold the franchise to Frank O'Neill in 1969 in defiance of the prior demand made on Ross for the return of the franchise upon his default.

In the original complaint, which was considered in *Price v. Ross, supra,* the plaintiffs merely requested the reconveyance of the franchise, but the sale to O'Neill occurred subsequent to the first complaint and prior to

the second amended complaint, which underlies the present action.

The plaintiffs are entitled to a recovery from Ross on the theory of conversion. Ross' failure to convey the studio to Price and Brodie when an appropriate demand was made after default constituted conversion. Prosser, *Torts* (hornbook series, 4th ed.), pp. 89, 90, sec. 15. We held in *Topzant v. Koshe* (1943), 242 Wis. 585, 588, 9 N. W. 2d 136, that, where a defendant has sold converted property:

" '. . . the plaintiff may, at his election, recover as his damages the amount for which the same were sold, with interest from the time of the sale to the day of trial.' "

In the instant case, the plaintiffs are entitled to damages to be measured by the consideration paid by O'Neill. While the gross amount of that sale is set forth in the record, the payment was not simply a cash disbursement but involved a complicated scheme of future payments and the offset of debts. While the plaintiffs state that the consideration is clear from the record, the defendant disputes their figures and their interpretation. The actual damages due for the conversion should be determined by appropriate findings of the trial court.

Further consideration of the record may lead the trial judge to the conclusion that the record is sufficient to make the appropriate findings without the necessity of further evidence or testimony. If the record is deemed complete, he should make such finding. If, however, he concludes that additional testimony or evidence is required, he is directed to conduct further proceedings and to make the necessary findings and to order judgment in accordance therewith.

*By the Court.*—Judgment reversed, and cause remanded for further proceedings consistent with this opinion.