STANISLAW A. G. SIEDLECKI v. R. D. POWELL AND PRODUCTS INTERNATIONAL, LTD.

No. 7710SC386

(Filed 20 June 1978)

**1. Contracts § 29.2— breach of contract—damages—value of stock at time subsequent to breach**

In an action for breach of a contract providing that plaintiff would receive 15% of the stock of a corporation being formed by the individual defendant, the trial court did not err in determining the value of the stock plaintiff was to receive based upon the consideration defendants received subsequent to the breach from the sale of the assets of a second corporation into which the original corporation had been merged, rather than basing plaintiff's damages on the value of the stock on the date of the breach, where the court found that the ascertainment of the value of the stock on the date of defendants' breach of the contract was rendered impossible by accounting procedures used by defendants.

**2. Contracts § 29.2— breach of contract to provide stock—value of stock—findings by court**

In an action for breach of a contract provision that plaintiff would receive 15% of the stock of a corporation formed by the individual defendant and later merged into another corporation, the evidence supported the trial court's finding of fact allocating the assets of the corporation formed by the merger between its pre-merger predecessors, the corporation whose stock plaintiff was to receive and another company.

**3. Contracts § 26.3; Witnesses § 6— evidence of insurance—competency**

In an action for breach of a contract provision that plaintiff would receive 15% of the stock of a corporation being formed by the individual defendant, evidence of an agreement between defendant corporation and some of its stockholders creating an escrow fund for payment of any damages awarded to plaintiff and funded by part of the purchase price of each share of stock purchased by the corporation from its stockholders, even if constituting evidence of insurance coverage, was admissible to show the value of the corporation's stock and to show the bias of a witness who was a party to the agreement.

**4. Costs § 4.1— expert witness fee— necessity that witness be subpoenaed**

The trial court erred in setting an expert witness fee for plaintiff's witness to be taxed as part of the costs in the action where the witness did not testify in obedience to a subpoena.

APPEAL by defendants from *Bailey, Judge*. Judgment entered 22 December 1976 in Superior Court, WAKE County. Heard in the Court of Appeals 27 February 1978.

The circumstances giving rise to this breach of contract action can be summarized as follows: Plaintiff, a naturalized U.S. citizen and native of Poland, had developed contacts with manufacturers and officials in Poland. Plaintiff had done research into the idea of importing golf carts to be manufactured by a Polish company, Elektrim. By early 1970, plaintiff had arranged with a Mr. Jennings to provide the financing for the import undertaking, and had contacted and begun negotiations with Polish authorities. At some point during the negotiation stage, plaintiff discovered that Jennings was not capable of financing the undertaking, and severed his relationship with him.

Plaintiff next contacted Mr. Troy Cotton, and through him, defendant Powell, about financing the undertaking. On 4 June 1970, plaintiff came to North Carolina and met with defendant Powell and his associates. As a result of negotiations, plaintiff and defendant Powell executed a contract on 5 June 1970 whereby plaintiff agreed to become employed by a company to be formed by defendant Powell for a salary of $12,000 per year, moving expenses from Alabama to the Fuquay-Varina area, and 15% of the stock of the proposed new company. Plaintiff agreed to assign all his contracts, agreements, options and contacts to the proposed new company, at which time the aforementioned stock was to be issued to him. Defendant Powell agreed to form the proposed company "for the purpose of establishing a business involved in importing and distributing products from various countries outside the United States" and "to make all necessary arrangements for adequate capitalization and lines of credit to enable the proposed new company to function in a satisfactory and efficient manner at such time and place as all preliminary investigations, considerations, negotiations and preparations have been completed to his satisfaction."

On 23 June 1970, the proposed company was incorporated, under the name of Products International, Ltd. (hereinafter "old" Products International), and 500 shares of stock were issued to Golf Carts, Inc. (hereinafter Golf Carts); defendant Powell owned 51% of the stock of Golf Carts.

The parties subsequently journeyed to Poland where negotiations transpired. A contract was secured in July 1970, which plaintiff forwarded to defendant Powell, who had returned home. This original contract was never executed.

On 15 August 1970, after his return to the United States, plaintiff met with defendant Powell and two associates, at which meeting defendant Powell expressed dissatisfaction with the contract that had been sent from Poland, especially with the requirement of two irrevocable letters of credit in the amount of $380,000 each. Defendant Powell told plaintiff that if he did not agree to reduce his equity participation in "old" Products International to 5%, then defendant could not go through with the contract. The evidence is conflicting as to whether plaintiff agreed to the reduction or merely agreed to consider it.

A contract dated 18 September 1970 between Elektrim and "old" Products International was executed calling for the manufacture by Elektrim of 25,008 golf carts over a four-year period. The aforementioned letters of credit were issued.

Plaintiff received compensation of $1,000 per month while employed with "old" Products International. At a meeting between plaintiff and defendant Powell on 24 February 1971, according to plaintiff's testimony a proposed contract dated 1 December 1970 was handed to him which was not completely what he expected (it provided for a 1 year term of employment with $12,000 salary and a bonus in the amount of 5% of the net after tax profits of "old" Products International). Plaintiff explained that he would like to take the document to an attorney, whereupon defendant Powell became angry and accused plaintiff of disloyalty, at which time plaintiff tendered his resignation. According to defendant Powell's testimony, the proposed agreement had been given to plaintiff in December 1970, and at the 24 February 1971 meeting, he merely confronted plaintiff with acts of disloyalty.

On 16 August 1971, "old" Products International was merged into Golf Carts, Inc., and the name of the surviving corporation was changed to Products International, Inc. (hereinafter "new" Products International). Plaintiff never received shares of stock in either "old" Products International or "new" Products International.

In 1973, the assets of "new" Products International were sold in separate transactions to Pezetel, a Polish company, and Eddietron Leasing Corporation of the Piedmont Triad.

The trial court, sitting without a jury, found facts and concluded that plaintiff was entitled to recover an amount equal to the value of 15% of the stock of "old" Products International, and awarded judgment in favor of plaintiff in the amount of $52,511.25. From this judgment defendants have appealed.

*Bailey, Dixon, Wooten, McDonald & Fountain, by Wright T. Dixon, Jr., John N. Fountain and Richard G. Cheney, for plaintiff.*

*Poyner, Geraghty, Hartsfield & Townsend, by Marvin D. Musselwhite, Jr. and Cecil W. Harrison, Jr., for defendants.*

BROCK, Chief Judge.

Defendants bring forward 28 assignments of error on appeal, six of which are argued in their brief in four arguments. The rest are deemed abandoned. App. R. 28(a).

[1] We first discuss defendants' second argument based upon assignments of error numbers 26 and 27, by which defendants contend that the trial court erred in awarding damages to plaintiff based upon the value of a share of stock of "new" Products International as of 30 November 1973. Defendants contend that damages, if any, should be measured as of 17 March 1971, which is the date plaintiff tendered demand for 15% of the stock of "old" Products International. We disagree.

This is an action for damages for breach of contract. "As a general rule, the damages upon breach of contract are to be measured as of the date of the breach." 22 Am. Jur. 2d, Damages, § 52, p. 81. The trial court departed from the general rule for the reasons set out in the following findings of fact:

> "30. No books were kept after November 30, 1970, which accurately reflect the separate operations of the merging corporations and none were kept after the merger from which the separate activity of the original Products International, Ltd. and the original Golf Carts Incorporated can be identified."

> \* \* \*

> "40. From the books and records of the Corporation it is not possible to determine the relative value of a share of

> stock of Products International, Ltd. compared with a share
> of Golf Carts Incorporated as of 17 March 1971 (the date of
> demand) this is in no way due to any act or omission of the
> plaintiff but, is on the other hand, entirely due to the acts of
> the defendant Powell in causing all records to be con-
> solidated and no value to be placed on the import contract of
> September 1970. R. D. Powell was fully aware of the claim of
> the plaintiff at the time of merger and was well aware that
> the exclusive import contract had a substantial value."

(Defendants are deemed to have abandoned their assignments of
error based upon exceptions to these findings of fact, as noted
*supra.*) In light of these findings, defendants will not be heard to
complain of the trial court's action determining the value of the
stock at issue based upon the consideration received by defend-
ants from a sale of the assets of the merged corporation subse-
quent to their breach of the contract with plaintiff. We think it
would be unconscionable to apply the rule for measurement of
damages urged upon us by defendant. To do so would impose
upon plaintiff a burden of proof made impossible by defendants'
deliberate conduct relating to their accounting procedures. There
is considerable authority, in cases dealing with breach of contract
to deliver stocks or bonds or for conversion of stocks or bonds,
for measuring damages based on valuation at a time subsequent
to the commission of the wrongful act. *See* Annot. 161 A.L.R. 316,
*et seq.* (1946). Furthermore, in at least one jurisdiction in cases in-
volving conversion of stock, damages have been measured by the
consideration paid to the wrongdoer by a subsequent purchaser of
the converted stock. *See Topzant v. Koshe,* 242 Wis. 585, 9 N.W.
2d 136 (1943); *Price v. Ross,* 62 Wis. 2d 335, 214 N.W. 2d 770 (1974)
(failure to assign franchise agreement); *see also Frey v. Frankel,*
443 F. 2d 1240 (10th Cir. 1971). That the instant action was for
breach of contract rather than conversion is an insignificant
distinction for purposes of this discussion. The subject of the ac-
tion in either case is the failure to deliver stock. In the case *sub
judice,* the ascertainment of damages at the time of defendants'
wrongful conduct was rendered impossible by defendants,
through no fault of the plaintiff; this, in our opinion, warranted
the damage measurement adopted by the trial court. Defendants'
assignments of error numbers 26 and 27 are overruled.

Siedlecki v. Powell

[2] In their first argument, covering assignments of error numbers 19 and 27, defendants challenge the trial court's finding of fact number 34 and the conclusion of law based thereon.

In finding of fact number 33, the validity of which is not challenged by this appeal, the court found that the 1973 liquidation of "new" Products International was for a total sum of $1,187,095.00. In the challenged finding of fact number 34, the court found as follows:

> "34. $386,116.00 of the above amount represented physical assets owned and Golf Carts leases and sales originally belonging to Golf Carts, Inc. prior to the merger. $800,979.00 represented carts in inventory and the import contract and exclusive sales agreement originally held by Products International before the merger."

Based upon findings of fact numbers 33 and 34, the trial court concluded as a matter of law that 67% of the total sales price ($800,979 out of $1,187,095) was derived from the sale of assets of "old" Products International. Defendants contend that finding of fact number 34 is not supported by any evidence which was before the trial court, and thus does not support the court's conclusion of law.

Finding of fact number 34 essentially concerned an allocation of the assets of "new" Products International between its premerger predecessors, Golf Carts and "old" Products International, as a means of ascertaining the component value of "old" Products International in "new" Products International since, as further found by the court, plaintiff was entitled to recover 15% of the value of the stock in "old" Products International by virtue of his contract with the defendant Powell. The $800,979 figure represented the gross price paid by Pezetel for assets purchased from "new" Products International.

Plaintiff's expert witness, Dr. Thomas F. Keller, testified as to several methods of apportioning the assets between the two corporations, one of which used the gross sale figure, which was the method adopted by the trial court. Dr. Keller testified in part as follows:

> "Based on [financial records and information such as tax returns, financial statements, accountant's working papers,

etc.], I made a study as to the value of Golf Carts, Inc., Products International, and the two components of the merged corporation, Products International, Ltd. The data is comingled and it becomes very difficult to separate the two corporations after November 30, 1970, but using some of Mr. Phillips' [defendants' accountant] working papers and data supplied by the defendant, I have indeed made some studies attempting to show a breakdown, at least a feasible breakdown of the assets of the corporation. The date I have used, the terminal date, when we have a value of the corporation, is shown on a balance sheet on a tax return of November 30, 1973, which is the date the corporation held its assets, cash and accounts receivable, and some liability.

I have also made studies as to the portion between Golf Carts and Products International in the merged corporation. I have attempted to divide the consolidated or combined corporation into two parts, again using the data provided essentially by Mr. Phillips. I have attempted to allocate the corporation, the two parts, using two methods. I have also attempted to use stock values for some of the trades that have taken place between the corporation and certain stockholders as evidence of value at particular dates, in an attempt to arrive at a value number in addition to a book value number."

*    *    *

"Going back to my two methods of apportioning the assets between the two corporations, in one case we had the sale of certain assets of the combined corporation to Eddietron. Some other assets were sold to Pezetel. My recollection is that the sale to Eddietron was during the year 1972 and constituted a sale of a building, some rental carts, or contracts which were for rental carts with certain customers of Golf Carts, Inc. I have seen the sale to Pezetel, which was apparently an inventory of the new golf carts on hand at the date of the sale, plus certain parts and other miscellaneous assets. I have used these two sales prices as an estimate of the value — let me change the word 'value' — of the part of the assets that were attributable to Golf Carts on one hand and the part of the assets that were attributed to Products International on the other hand. I have asserted that if, in

fact, these two values did reflect the assets as of the date of their respective sales, that we could then divide the total remaining assets composed of cash and accounts receivable on a proportionate basis between these two component parts. The sale to Pezetel was in the approximate dollar value of $800,000. That would be a gross sale figure as far as I could tell."

Defendants contend that Dr. Keller erroneously assumed that the assets sold to Pezetel were exclusively attributable to "old" Products International. In this regard, we note the witness' observation relating to the co-mingled financial data which rendered separation of the merged corporation very difficult; furthermore, we note once again the trial court's findings of fact relative to the deficiencies in defendants' bookkeeping, especially finding of fact number 30, *supra*. Dr. Keller's allocation of assets between the two pre-merger corporations was an estimate based upon his examination of defendants' financial records. Based upon the circumstances, we hold that this evidence supports the trial court's finding of fact number 34. The challenged finding of fact, supported as it is by evidence in the record, is conclusive on appeal. *Blackwell v. Butts*, 278 N.C. 615, 180 S.E. 2d 835 (1971). Defendants' assignment of error numbers 19 and 27 are overruled.

[3] Defendants next assign as error the introduction into evidence of a 1974 escrow agreement between the defendant corporation and several of its stockholders which established a fund for payment of the damages, if any, which might arise from the instant litigation. By its terms, the escrow was established pursuant to a purchase of stock by the defendant corporation from its stockholders and was funded by part of the purchase price of each share. Defendants contend that the agreement was an insurance fund, evidence of which was inadmissible. We disagree.

Evidence of insurance coverage is admissible if it has some probative value other than to show the mere fact of its existence. 1 Stansbury's N.C. Evidence (Brandis Rev. 1973) § 88, p. 274. The escrow agreement was admissible as evidence of the value of the defendant corporation's stock. Furthermore, as argued by the plaintiff, it was admissible to show the bias of defendants' witness Clem Sharek, a party to the agreement. *Id.* This assignment of error is overruled.

[4]   In their final argument, defendants assign error to the trial court's order setting an expert witness fee for plaintiff's witness, Dr. Keller, to be taxed as part of the costs in the action. This assignment of error has merit.

G.S. 7A-314(a) and (d) allow the court to set an expert witness fee. As interpreted by our Supreme Court in *State v. Johnson*, 282 N.C. 1, 191 S.E. 2d 641 (1972), the statute requires that a witness must be under subpoena before he or she is entitled to compensation. Under this interpretation, the trial court had no authority to order the fee on behalf of Dr. Keller, who admittedly did not testify in obedience to a subpoena. Plaintiff's argument that the provisions of G.S. 7A-314(a), allowing fees for a witness "under subpoena, bound over, or recognized" should be read in the alternative, is persuasive; however, we are bound by the decision of the Supreme Court. We hold, therefore, that the order allowing the expert witness fee must be reversed.

The judgment of the trial court awarding damages to plaintiff for breach of contract is affirmed. The order as to expert witness fees for plaintiff's expert is reversed.

Affirmed in part, reversed in part.

Judges VAUGHN and ERWIN concur.